UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS

| | |
|---|---|
| In the Matter of<br>JULIETTE KAWEESA<br># A 75 835-579<br><br><br>Petitioner | )<br>)<br>)<br>)  Motion to Reopen, Rescind<br>)  *In Absentia* Removal Order, and Stay<br>)  Removal<br>)<br>)  **DETAINED**<br>)<br>) |

## EMERGENCY MOTION TO REOPEN, RESCIND *IN ABSENTIA* REMOVAL ORDER AND STAY REMOVAL

Based on newly discovered evidence and changed country conditions in her native Uganda, Petitioner Juliette Kaweesa respectfully requests that the BIA grant her motion to reopen, rescind her *in absentia* removal order, and stay her removal so that she may have the opportunity to present her asylum and Convention Against Torture ("Torture Convention") claims to an Immigration Judge. Ms. Kaweesa is currently scheduled to be removed to Uganda on April 21, 2004, where she fears torture and death based upon past persecution and increasing threats of future persecution. Although she has not committed any crimes, Ms. Kaweesa has been in immigration detention for nine months, having been ordered removed *in absentia* when she showed up a few days late to her master calendar hearing because she misremembered the date.

The new evidence, described below, speaks to: a) the validity of her past persecution claim, b) the likelihood that she will be persecuted or tortured upon her return, c) the reasons she will be persecuted upon her return, d) the reasons why she

1

missed her master calendar hearing, and e) the reasons why she did not bring her claims more quickly. The new evidence includes:

* Affidavit from Dr. Michael Alan Grodin, Director of the Law, Medicine, Ethics and Human Rights Program and Professor of Psychiatry, Health Law, and Socio-Medical Sciences and Community Medicine at the Boston University Schools of Medicine and Public Health, dated April 12, 2004 (attached hereto as Exhibit 1).

* Recently- released new country conditions research, including a 76-page Human Rights Watch report, entitled "State of Pain: Torture in Uganda," dated March 26, 2004 and the 2003 U.S. State Department Country Conditions Report on Uganda, released February 25, 2004 (attached hereto as Exhibits 2 and 3).

* Affidavit of Dr. Douglas A. Feldman, Tenured Professor of Anthropology at SUNY Brockport and an Africanist specialist, dated April 12, 2004 (attached hereto as Exhibit 4); and

* Declaration of Fred Sempijja, Ms. Kaweesa's adult son in Uganda, received April 13, 2004 (attached hereto as Exhibit 5).

This previously unavailable and undiscoverable material evidence --taken in conjunction with the evidence already in the record -- demonstrates Ms. Kaweesa's *prima facie* eligibility for relief under asylum law, withholding of removal, and the Torture Convention. This evidence also shows that Ms. Kaweesa deserves to have her claims heard on the merits before she is removed to a country where – based on past persecution and changed country conditions -- she is convinced she will be tortured and killed.

I.   FACTS AND PROCEDURAL HISTORY

Ms. Kaweesa served as a Christian minister in Uganda. See Motion to Reopen Removal Proceedings and to Stay Removal, dated July 25, 2003, and supporting exhibits. She worked mainly with women and children and was well known in Kampala for her preaching and music ministry. Id.; see also Ex. 6, Affidavit of Rev. Baker Katende, dated April 9, 2004. She often traveled with a portable microphone to preach and sing and

would lead prayer groups. Id. She became involved with a group called Human Rights Africa because they promoted respect for women, a message she shared with the women she spoke to through her ministry. Id.; see also Ms. Kaweesa's *pro se* Application for Asylum (I-589), dated October 28, 1997.

Ms. Kaweesa's husband, Stephen Kaweesa, was the pastor of the Heritage Revived Church in Uganda until he was taken away from their home by government security officers in 1994. Id. He was never heard from again and is presumed dead. Ms. Kawessa believes that her husband was involved in a rebel freedom movement or opposition party. Id. She also suspects that her brother was involved in such a movement. Id.

Soon after her husband was taken away and disappeared, Ms. Kaweesa was detained by government security forces while she was about to speak at one of her church's "Crusades." Id. Men in military uniforms took her to military barracks outside Kampala, where she was detained, beaten, kicked, and raped by several different men. Id. She escaped detention and entered the United States on August 2, 1994 on a B-2 visa. Id. She filed her application for asylum *pro se*. Id. Her case was referred to an Immigration Judge for lack of detail. See Referral Notice, dated February 22, 1999.

Ms. Kaweesa was sent a notice that her Master Calendar hearing was scheduled for May 13, 1999 but misremembered the date as May 17, 1999. Id.. When she realized her mistake, she went to the Immigration Court and asked to speak to the Judge. The clerk told her that she could not speak to the Judge but that she could file a Motion to Reopen. She submitted a handwritten Motion to Reopen on May 19, 1999 and later hired an attorney to help her supplement her Motion to Reopen and eventually appeal the

denial of her motion to the BIA. See Motion to Reopen dated May 19, 1999; see also Brief. of the Respondent to the Board of Immigration Appeals, dated September 17, 1999, at 2 ("On June 9, 1999, Ms. Kaweesa, through her counsel, supplemented her Motion to Reopen with her affidavit."). *The Immigration Service did not oppose Ms. Kaweesa's motion to reopen.* Id.; see also June 23, 1999 Decision of the Immigration Judge ("[T]he Service will be deemed unopposed.")

The Immigration Judge denied her motion on June 23, 1999, stating:

> "Although the respondent's error is not incomprehensible, she has failed to demonstrate that exceptional circumstances beyond her control prevented her from attending these proceedings. The respondent could have easily contacted the Court to verify her hearing date to avoid her dilemma."

Id.

The BIA affirmed the denial of her motion to reopen without an opinion on May 6, 2002. Although neither Ms. Kaweesa nor her attorneys realized it at the time she missed her hearing, there is strong evidence to suggest that Ms. Kaweesa was suffering from Post Traumatic Stress Disorder (PTSD) and depression (Major Depressive Disorder or MDD) – medical conditions which "frequently interfere with memory." See Ex. 1, Affidavit of Dr. Grodin at ¶ 33. This evidence will be discussed fully in Section I below.

In 2001, Ms. Kaweesa learned that her son Fred Sempijja had been badly beaten in Uganda, suffering injuries that left him hospitalized. See Motion to Reopen Removal Proceedings and to Stay Removal, dated July 25, 2003 and supporting exhibits. Fred informed her that several plainclothes men driving army trucks had come to the house looking for her. Id. When he said he didn't know where she was, they began to beat

4

him. Id. Since that time, Fred has been in hiding due to his fear that he will be killed on account of his relationship to Ms. Kaweesa. Fred's Declaration explaining what happened constitutes previously unavailable evidence of worsening country conditions. See Ex. 4.

Ms. Kaweesa has been in the physical custody of the Department of Homeland Security since June 2003. Id. Undersigned counsel accepted her case on March 2, 2004. Ms. Kaweesa is currently detained at Bristol Country House of Corrections in North Dartmouth, Massachusetts. On April 1, 2004, we received notice from the Assistant U.S. Attorney that her removal "has been scheduled to go forward on April 21, 2004." See Ex. 8.

A stay is necessary to prevent her imminent removal and to allow her to present her asylum, withholding and CAT claims in accordance with due process. Ms. Kaweesa repeatedly expresses her fear that because of what she suffered in Uganda and what happened to her son, Fred, the Ugandan authorities have not "forgotten" about her, despite the passage of time. She repeatedly states that as sad as immigration detention is, she would rather stay in detention "forever" than be deported to Uganda, which she views as a death sentence.

ARGUMENT

I.  PETITIONER'S *IN ABSENTIA* REMOVAL ORDER SHOULD BE RESCINDED IN LIGHT OF NEW PSYCHOLOGICAL EVIDENCE DEMONSTRATING THAT SHE MISSED HER HEARING DUE TO "EXCEPTIONAL CIRCUMSTANCES," TO WIT: SERIOUS ILLNESS BEYOND HER CONTROL.

Ms. Kaweesa's *in absentia* removal order should be rescinded in light of previously unavailable medical evidence that explains why Ms. Kaweesa misremembered the date of her hearing -- namely the April 12, 2004 expert report of Dr. Grodin, Director of the Law, Medicine, Ethics and Human Rights Program and Professor of Psychiatry, Health Law, and Socio-Medical Sciences and Community Medicine at the Boston University Schools of Medicine and Public Health. See Ex. 1. Dr. Grodin's conclusions with respect to the trauma Ms. Kaweesa underwent and would reexperience if forced to return to Uganda are discussed in more detail below in Section II. The following excerpts from Dr. Grodin's report pertain specifically to factors that explain how she misremembered the date of her hearing:

* "Ms. Kaweesa has symptoms which include helplessness and hopelessness. **Ms. Kaweesa has on several occasions had daydreams so vivid that she thinks she is being tortured again (flashbacks). She avoids activities, actions or thoughts that in some way may resemble her trauma. She has problems falling asleep and maintaining sleep and has frequent frightening nightmares. She continues to feel on edge and is hyper vigilant.** She finds it very difficult to trust people. She feels emotionally numb and has difficulty concentrating. Ms. Kaweesa often feels detached and suffers from a restricted range of affect and anhedonia." (Id. at ¶ 22, emphasis added).

* Ms. Kaweesa displays moderate symptoms of MDD and PTSD. She has sadness, anhedoina, ruminations, avoidance, flashbacks and dissociations **all of which significantly impact on her thought process and acts of daily living. Such symptoms frequently interfere with memory. Memory loss can lead to contemporary problems in concentration as well as remote problems with memory details.** Upon arrival in the U.S. she was culturally unfamiliar with the U.S. medical and legal systems. She was

6

fearful of what might happen to her in the U.S. **She has a past history of trauma.** Upon arrival in the U.S. she was isolated and depressed. **All of these factors can explain her initial delay in filing her asylum claim. These factors could also contribute to her forgetfulness and misremembering the date of her master hearing.** (Id. at ¶ 33, emphasis added).

* "Ms. Kaweesa's mental health symptoms are consistent with the diagnosis of PTSD, depression and anxiety. **PTSD is a group of symptoms that individuals experience after being exposed to extremely traumatic experiences** such as combat experience, **physical**, mental or **sexual torture,** and major natural catastrophes. . . . Ms. Kaweesa presents on examination all the criteria to define PTSD according to the American Psychiatric Association Diagnostic Statistical Manual (DSM) IV TR. . . ." (Id. at ¶ 28, 29, emphasis added)

* "Because of Ms. Kaweesa's symptoms and their severity, **I would recommend prescribing an antidepressant known to alleviate anxiety-related symptoms and also to be effective on patients with PTSD.** " (Id. at ¶ 32, emphasis added)

"Exceptional circumstances" are defined as "exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien." See § INA 240(e)(1). Serious psychological illnesses like PTSD or depression clearly fall within this definition as they are beyond the noncitizen's control. See, e.g., Juan Carlos Macias Chaires v. Ashcroft, 2003 U.S. App. LEXIS 15126 (July 24, 2003) (BIA abused its discretion in denying motion to reopen where immigrant missed hearing because he was suffering from depression and anxiety). Here, the Immigration Judge committed clear legal error when he concluded, "The respondent could have easily contacted the Court to verify her hearing date to avoid her dilemma." See June 23, 1999 decision of Immigration Judge. This reasoning would make sense if Ms. Kaweesa *had realized* that she was uncertain as to the date of her hearing. But she missed her hearing by a few days *precisely because* she did not realize that she had misremembered the date and was not on notice of her error. Such an innocent, understandable mistake should not

7

forfeit Ms. Kaweesa's right to a hearing. Indeed, courts have found innocent date mix-ups to constitute exceptional circumstances *even absent evidence of a psychological illness*. As one court noted in a case involving an applicant for adjustment of status,

> "His failure to appear on the correct date was due either to a miscommunication by the interpreter or a misunderstanding by [the applicant.] In either event, it was simply a mistake in dates that all of us are prone to make at one time or another... The point is that this type of mistake in dates can be made by any of us. Our system of justice generally takes this into account in rectifying defaults and instead determining matters on the merits.

See Barseghian v. INS, 2001 U.S. App. LEXIS 15118. *4-*5 (9th Cir. July 2, 2001).

In deciding what constitutes "exceptional circumstances," courts must "look to the particularized facts and the totality of the circumstances presented in each case." Id. (citing Singh v. INS, 213 F.3d 1050, 1052 (9th Cir. 2002)); see also In re Rafael Flores Morfin, 2003 WL 23216785 (BIA, October 7, 2001) (applying Singh standard to find "exceptional circumstances" where respondent did not attend hearing because his car broke down). Accordingly, the Immigration Judge and the BIA erred in failing to take into account the undisputed fact that Ms. Kaweesa sought to reopen the *in absentia* order *pro se* as soon as she could after she realized her mistake – only six days after the scheduled hearing. See, e.g., Nazarova v. INS, 171 F.3d 478, 481 (7th Cir. 1999) (reversing BIA's denial of motion to reopen on due process grounds where immigrant showed up late to hearing because of delays by the interpreter and less than one week later, submitted a handwritten motion to reopen). There is simply no indication that Ms. Kaweesa's error was due to a desire to flee or a failure to take her responsibilities seriously. Moreover, it is noteworthy that the very disability that contributed to Ms. Kaweesa's memory problem was itself a result of the trauma she underwent, which in

8

turn was *prima facie* evidence of the validity of her claim. See Ex. 1, Affidavit of Dr. Grodin.

Finally, to be consistent with the Due Process Clause of the Fifth Amendment of the Constitution, the "exceptional circumstances" requirement set forth in the statute and regulations must be read to take into account the harm that the noncitizen would face if not given a hearing and balance that against the prejudice the government would face by allowing the hearing to go forward. See Nazarova v. INS; Barseghian, 2001 U.S. App. LEXIS 15118 at *4-*5 (weighing inconvenience to the Service against the "grave harm" to the immigrant in "not requiring the proceeding to be heard on the merits," especially where the immigrant's claim for adjustment of status was not frivolous). It is a "cardinal principle" of statutory construction that courts have a duty to read statutory and regulatory provisions to avoid Constitutional infirmities and Constitutional questions. See Zadvydas v. Davis, 121 S. Ct. 2491, 2498 (2001). At stake in Ms. Kaweesa's hearing was whether her life and freedom would be in danger if she were removed to the country she fled. Yet it is clear from the Immigration Judge's decision that neither the severity of the harm Ms. Kaweesa alleged, nor her *prima facie* eligibility for relief, nor the relatively minimal inconvenience to the immigration service caused by her missing her *master calendar hearing,* formed part of his determination. See Excerpt from June 23, 1999 Decision of the Immigration Judge, above. Indeed, the Immigration Judge failed to take into consideration the fact that the Immigration Service itself *did not oppose* Ms. Kaweesa's motion to reopen.

That the ultimate decision whether to reopen has been characterized as "discretionary" does not excuse clear legal errors or violations of due process, for even

9

discretionary decisions must take into account the relevant factors when Constitutional rights like life, liberty, and due process are at stake. Moreover, in a case such as Ms. Kaweesa's, where the risk of severe harm to the noncitizen is so great, the government itself has an interest in making sure that its removal decisions are the result of an adjudication on the merits, in accordance with the principles of Due Process. If, after a full hearing on the merits before the Immigration Judge, the evidence shows that Ms. Kaweesa is not entitled to relief under the Torture Convention or asylum laws, so be it, but such a weighty determination cannot constitutionally be made without a hearing.

II. PETITIONER'S MOTION TO REOPEN SHOULD BE GRANTED IN LIGHT OF PREVIOUSLY UNAVAILABLE MATERIAL EVIDENCE DEMONSTRATING CHANGED COUNTRY CONDITIONS AND *PRIMA FACIE* ELIGIBILITY FOR ASYLUM AND TORTURE CONVENTION RELIEF

Several pieces of new, previously unavailable and undiscoverable, material evidence demonstrate that Ms. Kaweesa: a) suffered past persecution and torture in Uganda, b) reasonably fears future persecution on account of her imputed political opinion, religious activities, and membership in the social group of her family, and c) is more likely than not to be tortured by government authorities if she is returned. Each of the new pieces of evidence and its significance is described below.

**A. Affidavit and diagnosis of Dr. Grodin, concluding that Ms. Kaweesa suffers from Post Traumatic Stress Disorder (PTSD) and Major Depressive Disorder (MDD).**

Dr. Grodin's diagnosis and affidavit support Ms. Kaweesa's claim that she suffered past persecution in Uganda, including rape and torture, and that she faces a

substantial risk of torture if she is returned. Dr. Grodin's principal findings, diagnosis, and conclusions with respect to this issue are as follows:

* "Ms. Kaweesa has symptoms which include helplessness and hopelessness. **Ms. Kaweesa has on several occasions had daydreams so vivid that she thinks she is being tortured again (flashbacks). She avoids activities, actions or thoughts that in some way may resemble her trauma. She has problems falling asleep and maintaining sleep and has frequent frightening nightmares. She continues to feel on edge and is hyper vigilant.** She finds it very difficult to trust people. She feels emotionally numb and has difficulty concentrating. Ms. Kaweesa often feels detached and suffers from a restricted range of affect and anhedonia." (Id. at ¶ 22, emphasis added).

* "Ms. Kaweesa's mental health symptoms are consistent with the diagnosis of PTSD, depression and anxiety. **PTSD is a group of symptoms that individuals experience after being exposed to extremely traumatic experiences** such as combat experience, **physical**, mental or **sexual torture,** and major natural catastrophes. . . . Ms. Kaweesa presents on examination all the criteria to define PTSD according to the American Psychiatric Association Diagnostic Statistical Manual (DSM) IV TR. . . ." (Id. at ¶ 28, 29).

* "Because of Ms. Kaweesa's symptoms and their severity, I would recommend prescribing an antidepressant known to alleviate anxiety-related symptoms and also to be effective on patients with PTSD. " (Id. at ¶ 32)

* "In summary, based upon the mental findings present during the examination and review of her history, Ms. Kaweesa presents **a story consistent with being physically, mentally, and sexually tortured.** Her symptom complex is what one might expect of someone exposed to trauma. Her presentation is not unlike other torture survivors and rape victims I have examined over the past 25 years of medical practice caring almost exclusively for immigrants and refugees at an inner city hospital and clinic." (Id. at ¶ 32).

* "Treatment recommendations are as follows: (1) medication to alleviate symptoms of PTSD, depression and anxiety; (2) individual psychotherapy with a culturally sensitive therapist who is also a trauma specialist. . . . The patient requires a safe and non-threatening environment that will promote psychological rehabilitation. **Removal from detention and remaining in the United States will provide the best environment for successful rehabilitation. Further detention will have a significant detrimental effect on her mental health.**" (Id. at 35, emphasis added).

* "Ms. Kaweesa fears she will be threatened, harassed, and persecuted because of her past religious, human rights, and political activity and the past religious, human rights, and political activities of her family members should she return to Uganda. **It is my assessment that due to the psychological vulnerability that exists after severe**

11

**traumatic experiences, returning to Uganda, the site of the trauma, would result in an exacerbation of her symptoms and a decline in her functioning and would therefore be threatening to her psychological and physical well being. Furthermore, Ms. Kaweesa stated that should she return to Uganda, she would be in danger of being attacked once again and perhaps killed. This added stressor compounds Ms. Kaweesa's psychological vulnerability."** (Id. at ¶ 35, emphasis added).

Dr. Grodin's diagnosis and findings are sufficient to show Ms. Kaweesa's *prima facie* eligibility for withholding of removal, asylum, and CAT relief. Past persecution of the severity that Ms. Kaweesa endured creates a presumption of a well-founded fear of future persecution, and can be sufficient, in itself, to establish protection even if country conditions have improved (which they have not). See 8 C.F.R. § 208.13(b)(1)(ii); see also Matter of N-M-A, Int. Dec. #3368 (BIA 1998). In addition, past torture inflicted upon the applicant is one of the factors courts look to determine the likelihood of future torture. See 8 C.F.R. § 208.16 (c)(3). This is not to say that Dr. Grodin's affidavit *proves* that Ms. Kaweesa is entitled to relief, but rather than it provides sufficient evidence to warrant a full evidentiary hearing on the merits.

Dr. Grodin's affidavit also helps explain Ms. Kaweesa's failure to raise these issues sooner: she was suffering from a debilitating psychological condition that interfered with her memory, and her ability to handle every-day activities. In addition, the trauma she suffered caused her to avoid circumstances that would retrigger or exacerbate her trauma. Finally, Dr. Grodin's report demonstrates the psychological harm Ms. Kaweesa has suffered in immigration detention and would suffer if returned to Uganda. In a case such as this, where the harm to the noncitizen is so great, the government has an interest in making sure that its removal decisions are the result of an adjudication on the merits, in accordance with the principles of Due Process.

**B.     Recent Human Rights Reports Demonstrating Changed Country Conditions, Including an Increase of Torture by the Government**

New evidence of the deteriorating human rights conditions in Uganda and the increase in the use of torture by the government has come to light since November 2003, when the Board denied Ms. Kaweesa's motion to reopen. The most significant source of newly-available, material evidence of changed country conditions is the March 26, 2004 76-page report published by Human Rights Watch, entitled "State of Pain: Torture in Uganda." See Ex. 2. Although excerpts do not capture the full force of the terror it documents -- in crushing, painstaking detail – the findings below provide a glimpse of why Ms. Kaweesa is terrified to return:

* "The use of torture as a tool of interrogation is foremost among **an escalation in the human rights violations by Ugandan security forces since 2001**. In what most victims consider a state-sanctioned campaign of political suppression, official and *ad hoc* military, security and intelligence agencies of the Ugandan government have **proliferated, practicing illegal and arbitrary detention and unlawful killing/extrajudicial executions and using torture to force victims to confess to links to the government's past political opponents or current rebel groups**." (Id. at 4, emphasis added).

* "Most victims of illegal detention and torture attribute their treatment of political suppression, reporting that security or military agents accused them of past or current political opposition, insurrection or support for rebel groups, treason or terrorism, **or of knowing persons involved in such activities.**" (Id. at 4, emphasis added)

* "Ugandan security and military agencies **routinely** take suspects to unacknowledged and ungazetted (not published in the official gazette) places of detention including safe houses and **army barracks.**" (Id. at 5, emphasis added).

* "These practices, **coupled with torture**, are designed to elicit confessions for use in military intelligence and sometimes for prosecution, and to discourage the suspect from persisting the alleged activities. As they are hidden and illegal, such practices provide an environment in which other unlawful acts are carried out, such as robbery and theft of personal property, settling of personal scores, and **sexual abuse and rape.**" (Id. at 5, emphasis added).

* "Although the regular police are accused of torture of ordinary criminal suspects, **it is the army and these other security units**, some of them created without statutory

13

authority, that are primarily responsible for torture in political cases." (Id. at 21, emphasis added).

*"The torture includes the **gang rape of females**; . . ." (Id. at 23, emphasis added).

* "The prisoners alleged they were tortured in the Gulu Fourth Division **army barracks detention center,** where they were placed in the quarter guard. They alleged they were subjected to ill treatment and torture there, **held in this room for two weeks with no light and insufficient food, and the one female prisoner was gang-raped**." (Id. at 45, emphasis added).

* "The government is provided "deniability" by **holding detainees in secret,** and this creates a feeling of impunity among security and intelligence officers." (Id. at 59, emphasis added).

The government and military's use of torture, extrajudicial killings, unlawful detentions, disappearances, and oppression of political opponents is documented by other sources as well. For example, the United States Department of State Country Report on Human Rights Practices in Uganda for 2003 (dated February 25, 2004), Ex. 3, states:

* "While civilian authorities maintained effective control of the security forces, there were frequent instances in which elements of the security forces acted independently of government authority. **Members of the security forces committed numerous serious human rights abuses**." (Id. at 1, emphasis added).

* "Security forces committed **unlawful killings**. Security forces were responsible for short-term disappearances. **Torture by security forces** and beating of suspects to force confessions were serious problems. Security forces were responsible for **incommunicado detention**, and prison conditions remained harsh and life threatening. . . . Arbitrary arrests and detention, including those of opposition politicians and their supporters. . . were problems. . . . The Government at times restricted freedom of speech, the press, and association, and severely restricted freedom of assembly." (Id. at 1-2, emphasis added).

* "During the year, **there were credible reports that persons died as a result of torture by security forces.**" (Id. at 2, emphasis added).

* "During the year, members of the **security forces continued to commit other unlawful killings**." (Id. at 3, emphasis added).

* "The Constitution prohibits such practices; however, there were **widespread and credible reports throughout the country that security forces tortured and beat**

14

**suspects in unregistered detention facilities** to force confessions. . . . In addition, there were **many credible reports of torture committed by security forces. . .** " (Id. at 6, emphasis added).

* "**There were a number of deaths in custody**, some due to torture." (Id. at 8, emphasis added).

*"The Constitution prohibits such practices; however, members of the security forces **arrested and detained citizens arbitrarily**." (Id. at 8, emphasis added).

* "The law restricts freedom of assembly, particularly for political groups, **by prohibiting any activities that interfere with the Movement system of governance**; in practice, security forces often enforced these restrictions." (Id. at 13, emphasis added).

These documents demonstrate that people like Ms. Kaweesa are at substantial risk of torture or other persecution on account of their imputed political opinions, religious activities, and social group membership as family members of people accused or suspected of rebel or opposition party involvement.

C.     **Declaration of Dr. Doug Feldman**

Another piece of previously unavailable material evidence is the April 13, 2004 expert report of Dr. Douglas A. Feldman, Tenured Professor of Anthropology at SUNY Brockport and an Africanist specialist. See Ex. 4. Dr. Feldman's report makes several findings that demonstrate that Ms. Kaweesa's fear of persecution and torture on account of imputed political opinion, religious activities, and her membership in the social group of her family is objectively reasonable, and that it is more likely than not that she will be tortured upon her return. Dr. Feldman's report also finds that *worsening* country conditions in Uganda will put Ms. Kaweesa at an increased risk of danger.

* "Military, intelligence, and security agents secretly arrest thousands of persons who are suspected of working for the political opposition or one of the many rebel groups in the country. **Often wives and other relatives are arrested for simply being related to the**

15

accused. Human Rights Watch indicates that the arrests have been **sharply increasing** since the rigged election held in March 2001." (Id. at ¶ 7, emphasis added).

\* "The [Human Rights Watch March 2004] report says, 'In many cases, suspects believe they were detained only because they personally knew those alleged to be fomenting rebellion, whether from place of origin, school, **living abroad, marriage, or other relationship.**' **Women are often gang raped and tortured today because of the activities of their male relative, who according to gender norms in Ugandan society, may often not inform the women of their political activities.**" (Id. at ¶ 9, emphasis added).

\* "It appears likely that someone with Ms. Kaweesa's history, who is deported from the United States to Uganda, would likely be detained and arrested immediately upon their return, especially given the large number of agencies involved in torture in Uganda and **the large increase in arrests today.** It is likely that one or more government agents would be working at the Uganda airport and be prepared to intercept her on her return. **She will likely not have the opportunity to flee to another part of Uganda, and even if she did, she would not be safe.**" (Id. at ¶ 10, emphasis added).

\* "**[I]t is evident that Ms. Kaweesa will likely be detained, arrested, and tortured and/or raped if she is returned to Uganda.** While it highly unlikely that her activism in women's rights or in her church -- standing along -- has had, or would have, an effect on how the government agents mistreat her, there is no question that her status as the wife of someone who was perceived as a political opponent is sufficient to explain her persecution. The evidence demonstrates that family members of perceived political opponents are routinely targeted in Uganda, regardless of whether they participate in the activities of their family members. **Moreover, it is reasonable to believe that Ms. Kaweesa's relationship to her husband caused the government to impute her husband's political activities and opinions to her, and that continuing to preach about women's rights – combined with her relationship to her husband – increased the risk that government security forces would view her as politically threatening.**" ( Id. at ¶ 11, emphasis added).

\* "**In my professional opinion, it is far more likely than not that she would be tortured, raped and beaten again if she returns to Uganda at this time.**" (Id. at ¶ 11, emphasis added).

Dr. Feldman's report is material to both Ms. Kaweesa's asylum/withholding claims and her Torture Convention claim. The report speaks cogently to the *reasons* why Ms.

16

Kaweesa is in particular danger, demonstrating her *prima facie* eligibility for asylum and withholding. In addition, it addresses the very factors courts are required to consider in adjucating Torture Convention claims, including evidence that the applicant could relocate to another part of the country of removal; gross, flagrant, or mass violations of human rights; and other relevant information concerning country conditions. See 8 C.F.R. § 208. 16(c)(3).

**D.    Letter of Fred Sempijja, son to Juliette Kaweesa, received April 13, 2004.**

The final piece of previously unavailable materials evidence is the letter from Ms. Kaweesa's son, Fred Sempijja, received on April 13, 2004. See Ex. 5. This letter recounts the persecution Mr. Sempijja is suffering in Uganda on account of his connection to his mother, Ms. Kaweesa. It contains previously unavailable evidence about changed country conditions in Uganda because it speaks to not only the persecution he underwent in 2001, but also its ongoing effects. See Ex. 6 ("[A]fter that as in 2001 on 26th of August men broke into my home and tried to kill me after I had failed to give them the whereabouts of my mother. Here [sic] am hunted to date and not staying home since the house was demolished. . ."). It explains why Ms. Kaweesa is afraid to return, even after much time has passed. This evidence also corroborates Ms. Kaweesa's past persecution. Id. ("My mother had to fly away after the condemning of our dad to death. My father and mother could gather groups of people and preach to them but I think it was because of this that they were misunderstood . . . My mother was beaten up there. After life became so difficult because she was wanted and looked after then she was forced to disappear . . .").

17

IV. **PETITIONER'S REQUEST FOR A STAY OF REMOVAL SHOULD BE GRANTED BECAUSE PETITIONER WILL SUFFER IRREPERABLE HARM IF REMOVED TO UGANDA WITHOUT A HEARING ON THE MERITS, PETITIONER IS LIKELY TO PREVAIL ON THE MERITS, AND A STAY OF REMOVAL WILL NOT PREJUDICE THE GOVERNMENT.**

As demonstrated by the new evidence described above, Ms. Kaweesa is at substantial risk of being killed, raped, tortured, or imprisoned if she is returned to Uganda. Ms. Kaweesa's fear of the harm that will befall her is objectively reasonable, in light of the persecution she and her family have endured at the hands of the government on account of their religious and political activities, including the severe beatings that left her son Fred hospitalized. Recent news reports from Uganda indicate that the human rights situation has worsened, with torture on the rise. The Ugandan government is presumed to know that Juliette will be deported soon because it granted the United States the travel papers for her. Ms. Kaweesa fears that Uganda will be waiting for her at the airport. See AffiEx. 4. If Ms. Kaweesa is deported to Uganda before the BIA can hear her motion to reopen and rescind is decided, it will be too late. Grant of a stay is particularly necessary in a case, such as this, where the petitioner has never "had her day in court." If her asylum, withholding and Torture Convention claims are rejected on the merits in accordance with principles of due process, so be it, but Ms. Kaweesa should not be made to suffer fear of an imminent death without having one chance to state her claim.

Having kept Ms. Kawessa – an individual with no criminal record -- in custody for nine months already, DHS will not be prejudiced by a stay pending the BIA's resolution of this matter. Indeed, as DHS often keeps detainees in custody for more than six months in order to negotiate the issuance of travel documents, it is not in a position to complain of any delay on Ms. Kaweesa's part, particularly, where as here, the evidence

demonstrates that Ms. Kaweesa suffers from PTSD and MDD, the effects of which have been exacerbated by her nine month detention. Finally, Ms. Kaweesa is a tremendous asset to her community, see Exs. 6. and 7 (Letter from Rev. Charles Bbosa, Senior Pastor, dated September 15, 2003) and merits a favorable exercise of discretion. For these reasons – and given the human rights at stake – any delay on Ms. Kaweesa's part should be forgiven. She has already paid the price for such delay by losing nine months of freedom; she should not be made to pay for her delay with her life.

## CONCLUSION

For the reasons set forth above, Ms. Kaweesa respectfully requests that the BIA grant her motion to reopen, rescind her *in absentia* removal order, and stay her removal so that she may have the opportunity to have her claims heard by an Immigration Judge.

Respectfully submitted this 14th day of April, 2004.

Respectfully submitted,

*Alexandra Dufresne*
Alexandra Dufresne, BBO #654959
Detention Attorney
Catholic Legal Immigration Network, Inc. (CLINIC)/
Boston College Immigration and Asylum Project
885 Centre Street
Newton, MA 02459
(617) 552-0593 (voice)
(617) 552-2615 (fax)
alexandra.dufresne.1@bc.edu
for Juliette Kaweesa

19