UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
JULIETTE KAWEESA,                   )
                                    )
          Petitioner,               )
                                    )
          v.                        )  CIVIL ACTION
                                    )  NO. 04-10513-WGY
JOHN D. ASHCROFT, Attorney          )
General, BRUCE CHADBOURNE,          )
Interim Field Director for          )
Detention and Removal, Boston       )
Field Office, Bureau of             )
Immigration and Customs             )
Enforcement, KATHLEEN M.            )
DENNEHY, Acting Commissioner,       )
Massachusetts Dep't of              )
Corrections, and the BUREAU OF      )
IMMIGRATION AND CUSTOMS             )
ENFORCEMENT                         )
                                    )
          Respondents.              )
                                    )
```

MEMORANDUM

YOUNG, C.J.                                    November 18, 2004

Habeas petitioner Juliette Kaweesa ("Kaweesa") seeks review
of an order of removal entered in absentia, and of the refusals
of the hearing officer and the Board of Immigration Appeals
("BIA") to reopen her case and to consider her for asylum or for
withholding of removal under the United Nations Convention
Against Torture and Other Cruel, Inhuman or Degrading Treatment

or Punishment[1] ("Convention Against Torture").  The respondents
(the "government") argue that this Court lacks jurisdiction over
Kaweesa's claims, and that they fail on the merits.  For the
reasons stated below, the Court holds that it has habeas
jurisdiction over at least one of Kaweesa's claims, but that the
proper course is to transfer the case to the United States Court
of Appeals for the First Circuit for consideration of a claim
that lies exclusively within that court's jurisdiction.

I.   INTRODUCTION

     A.   Factual Background and Procedural History

     The Court's description of the factual background relies on
Kaweesa's contentions, which are supported by record evidence.

     Kaweesa served as a Christian minister in a well-known
preaching and music ministry in Kampala, Uganda, and worked
primarily with women and children.  See Pet. for Writ of Habeas
Corpus and Emergency Mot. for Prelim. Inj. Staying Removal
[hereinafter "Pet."] [Doc. No. 10] Exs. 2.6 (4/9/04 Aff. of Rev.
Baker Katende), 8 (motion to reopen removal proceedings), 10
(Kaweesa's Declaration).  Her ministry involved preaching,
singing, and leading prayer groups.  Id.  She became involved
with a group called Human Rights Africa, and shared that group's

_____

     [1]The Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S.
85, was implemented in the United States by the Foreign Affairs
Reform and Restructuring Act of 1998, Pub.L. No. 105-277, § 2242,
112 Stat. 2681-761 (codified as 8 U.S.C. § 1231 (2000).

message of respect for women with the women to whom she spoke
through her ministry.  Id. Ex. 10; see id. Ex. 3 (application for
asylum).

Kaweesa's husband, Stephen, was the pastor of the Heritage
Revived Church in Uganda until he was taken away from their home
by government security officers in 1994.  Id. Exs. 2-3, 8, 10.
He was never heard from again and is presumed dead.  Id.  Kaweesa
believes that her husband and her brother were involved in a
rebel freedom movement or opposition party.  Id.  Kaweesa also
has information that both her parents and her brother have been
killed.  Id. Ex. 2.1 (copy of 4/12/04 Grodin Aff.) [hereinafter
"4/12/04 Grodin Aff."], ¶ 20.

Soon after her husband was disappeared,[2] Kaweesa was
detained by government security forces while she was about to
speak at one of her church's "Crusades." Pet. Exs. 2-3, 8, 10.
Men in military uniforms took her to military barracks outside
Kampala, where she was detained, interrogated, beaten, kicked,
and raped by several different men.  Id.  The interrogations
focused particularly on her activities with women and children.
See Kaweesa Decl. [Doc. No. 6] ¶ 3.  She was released from
detention, and entered the United States on August 2, 1994, on a
B visa that she had obtained to attend a religious conference.

_____

[2] The Court uses the verb "disappear" in the transitive
sense -- that is, "to cause (someone) to disappear, especially by
kidnaping or murder."

Id. ¶ 4.  According to the government, Kaweesa was authorized to
remain in the United States until February 1, 1995, and has
remained in the country unlawfully since then.  Resp't's Mem.
[Doc. No. 25] at 1.

Kaweesa filed a pro se application for asylum on October 28,
1997, and on February 22, 1999, her case was referred to a
hearing officer for lack of detail.  See Pet. Exs. 3, 4 (referral
notice).  According to the government, removal proceedings were
begun against her by an administrative Notice to Appear dated
February 23, 1999, and she was charged with deportability under 8
U.S.C. § 1227(a)(1)(B), as being an alien who has remained in the
United States for a time longer than permitted.  Resp't's Mem. at
1; see id. Ex. 1 (Notice of Removal).  Thus it appears that she
came to the government's attention because of her asylum
application.

Kaweesa was sent a notice that her Master Calendar hearing
was scheduled for May 13, 1999, but she misremembered the date as
May 17, 1999.  See Pet. Exs. 8, 10.  She failed to attend the May
13, 1999 hearing, and the hearing officer entered an order of
removal in absentia.

When she realized her mistake, on or about May 17, 1999, she
went to the Immigration Court and asked to speak to the hearing
officer.  6/7/04 Kaweesa Aff. ¶ 5.  The clerk told her that she
could file a Motion to Reopen, so she filed a handwritten Motion

to Reopen on May 19, 1999, and later retained Attorney Daniel
Cashman ("Cashman") to supplement her Motion.  See Pet. Exs. 8
(Motion to Reopen), 10.  The Immigration Service did not oppose
Kaweesa's Motion.  Id. Ex. 5 (hearing officer's Denial of
Motion).  It is unclear from the record whether it is common for
motions to reopen to go unopposed, or whether there was something
special about Kaweesa's case.

On June 23, 1999, the hearing officer denied Kaweesa's
Motion to Reopen.  In denying the Motion, the hearing officer
stated:

> Although the respondent's error is not
> incomprehensible, she has failed to demonstrate that
> exceptional circumstances beyond her control prevented
> her from attending these proceedings.  The respondent
> could have easily contacted the Court to verify her
> hearing date to avoid her dilemma.

Id.

The BIA affirmed without opinion on May 6, 2002.  Kaweesa's
brief had argued that the hearing officer should have excused
Kaweesa's failure to attend her hearing on grounds of exceptional
circumstances, and that the BIA was in any case free to consider
her asylum claim, even if an order of removal in absentia was in
place.  See Pet. Ex. 6 (copy of the brief).  Cashman informed
Kaweesa of the denial via a letter, but never informed her that
he no longer wished to represent her.  6/7/04 Kaweesa Aff. ¶¶ 10-
12.  He never contacted Kaweesa again, and never responded to any
of her telephone calls.  Id. ¶ 11.  He never informed her of her

5

legal options, such as the possibility of appealing her case to the First Circuit.  See id. ¶ 12.

In June or July 2002, Kaweesa consulted with Alex Almondel, who held himself out as an immigration attorney.  See id. ¶¶ 14-15, 19-24.  She paid him $1,500 in cash to appeal the BIA decision.  Id. ¶ 16.  She spoke to him in August 2002, at which time he told her that he had filed what she refers to as her "Motion to Reopen/Appeal."  Id. ¶ 17.  He showed her a blue piece of paper that was supposedly a receipt from the BIA, indicating that it had received her appeal.  Id. ¶ 18.  From August 2002 until March or April 2003, Kaweesa repeatedly called him, and he kept stating that he had not received a response from the BIA. Id. ¶¶ 20-21.  As far as Kaweesa was concerned, Almondel was pursuing her claims in a legally appropriate manner.

In April 2003, an article in a Boston newspaper revealed that Almondel was misrepresenting himself as an immigration attorney, even though he was not a licensed attorney in Massachusetts.  Id. ¶ 22.  Once Kaweesa saw this article, she immediately consulted Attorney Elizabeth Broderick ("Broderick"). Id. ¶ 23.  At this time Kaweesa discovered that Almondel had never submitted the papers he claimed he had submitted.  Id. ¶ 24.  Broderick immediately submitted a Motion to Reopen to the BIA, filing it on July 25, 2003.  Id. ¶ 25.  On June 17, 2003, shortly before the motion was filed, Kaweesa was detained and

placed in the Bristol House of Correction.  4/12/04 Grodin Aff. ¶ 21.

The BIA denied Kaweesa's motion on November 12, 2003.  Pet. Ex. 9 [hereinafter "11/12/2003 BIA Order"], at 1.  The BIA began by noting that the motion to reopen was untimely; it had to be filed by September 30, 1996, or within 90 days of the BIA's previous decision, whichever was later.  Id. (citing 8 C.F.R. § 1003.2(c)(2)).  The BIA then noted that there is an exception where a motion to reopen is untimely or numerically barred, if the respondent can demonstrate that changed circumstances giving rise to the new request for asylum have arisen in the country of nationality.  Id. (citing 8 C.F.R. §§ 1003.2(c)(2), (3)(ii)).  The BIA stated that "[a]n alien can meet this requirement by providing sufficient facts and supporting documentary evidence, through affidavits or other evidentiary material, to establish prima facie eligibility for the relief sought as required by 8 C.F.R. § 1003.2(c)(1)."  Id.  It held that Kaweesa had not met her burden.  Id.

The BIA stated that Kaweesa had failed to make a prima facie showing of eligibility for relief.  Id.  In particular, she did not "explain why she waited nearly one year after the Board's decision, and nearly two years after the alleged event to file her motion alleging changed country conditions."  Id. at 1-2.  It also noted that although Kaweesa had submitted a photograph of

her son "showing what may be a scar on his head," she had
submitted no medical reports, police reports, or affidavits
explaining how the injuries were sustained.  <u>Id.</u> at 2.  It
pointed to her failure to explain why the Ugandan government
would still be interested in her after ten years.  <u>Id.</u> at 2.

> The BIA thus concluded:
>
>> Nothing in the respondent's motion to reopen serves as
>> a basis for us to find that the respondent has made a
>> <u>prima</u> <u>facie</u> case that she would be harmed in light of
>> the alleged changed circumstances in Uganda. Therefore,
>> based on the total record before us, even assuming
>> <u>arquendo</u> the respondent's motion to reopen was not
>> untimely, we find that we have no basis for granting
>> the respondent's motion to reopen on changed
>> circumstances.

<u>Id. at 2.</u>  The BIA did not inform Kaweesa of her right to appeal
to the First Circuit.

Shortly after the BIA denied the motion, Broderick informed
Kaweesa that she was withdrawing from the case, suggesting that
Kaweesa should appeal to a senator from Massachusetts.  6/7/04
Kaweesa Aff. ¶ 27.  Kaweesa later wrote such a letter, apparently
to no avail.  <u>Id.</u> ¶ 28.  Broderick also appears to have informed
Kaweesa of her right to appeal to the First Circuit.  Although
she states in an affidavit that she "never notified Ms. Kaweesa
in writing of the possibility of appealing her case to Federal
Court or of the filing deadlines," Resp'ts Mem. Ex. 9 (3/16/04
Broderick Affidavit), ¶ 5, she also states that during phone
calls with Kaweesa she told her "that I was not hopeful about the

success of further appeals," id. ¶ 6.  It does not appear that
Broderick ever informed Kaweesa about filing deadlines for a
petition for review in federal court.  See id.

In February or March 2004, Kaweesa consulted with Attorney
Alexandra Dufresne ("Dufresne"), who filed another Motion to
Reopen with the BIA on April 15, 2004.  See 6/7/04 Kaweesa Aff.
¶¶ 29-30.  In the Motion to Reopen, Kaweesa argued that new
evidence demonstrated both the dangers she would face if she were
to return to Uganda and that her failure to attend her original
hearing before the hearing officer was caused by mental
disorders. Pet. Ex. 2 (Motion to Reopen Removal Proceedings and
to Stay Removal).

The first document Kaweesa submitted was a declaration from
her son, Fred Sempijja.  In 2001, Kaweesa learned that her son
had been badly beaten in Uganda, suffering injuries that left him
hospitalized.  See id. and accompanying Exhibits.  He told her
that several plainclothes men driving army trucks had come to the
house looking for her.  Id. Exs. 2.5 (Declaration of Fred
Sempijja), 10.  They beat him when he said that he did not know
where she was.  Id.  Since then, he has been in hiding, fearing
for his life because of his relationship to his mother.  Id.
Although Kaweesa relayed this information to the BIA while her
previous motion to reopen was pending before them, she did not

9

manage to obtain the declaration before the BIA handed down its November 12, 2003 decision denying that motion.

Kaweesa also submitted a March 2004 report from Human Rights Watch (a non-governmental organization), a February 25, 2004 report from the United States Department of State, and an April 12, 2004 affidavit from Douglas A. Feldman (a professor of anthropology and Africanist specialist at the State University of New York, Brockport), all tending to show that it would be dangerous for Kaweesa to return to Uganda.  See Pet. Exs. 2.2, 2.3, 2.4.  According to Professor Feldman:

> During the 1970's and early 1980's Presidents Idi Amin and Milton Obote led a campaign of terror in Uganda in which more than a half million Ugandans were systematically executed and tortured.  With the military takeover of President Yoweri Museveni in 1986, it was hoped that democracy would return to Uganda, [a]nd for a while it appeared that political and economic stability was returning to the country. However, Human Rights Watch just released a 76 page report last week ("State of Pain: Torture in Uganda," Vol. 16[4], March 2004) delineating a rapidly growing pattern of torture, rapes, and beatings among political detainees in Uganda.  The report documents that Ugandan security forces are torturing supporters of the political opposition and holding them in secret detention amid the government's pursuit of rebels involved in the country's armed conflict . . . .
>
> . . . The report graphically details, "[m]ilitary intelligence and security forces reportedly have suspended victims from the ceiling for hours or days in a position called kandoya (with their hands and feet tied behind their back), beaten them severely with wooden or metal rods, cables, hammers, or sticks studded with protruding nails, and subjected them to water torture in which the victim is forced to lie face up while a water spigot is opened directly into his mouth."  Military, intelligence, and security agents

secretly arrest thousands of persons who are suspected
of working for the political opposition or one of the
many rebel groups in the country.  Often wives and
other relatives are arrested for simply being related
to the accused.  Human Rights Watch indicates that the
arrests have been sharply increasing since the rigged
election held in March 2001.  The opposition leader,
Kizza Besigye, fled Uganda for his life after losing
the election that year.  Since then, many of his
supporters have been arrested and killed and/or
tortured.

      . . . The Ugandan Human Rights Commission reports
that "torture is on the increase and, during the period
[January 2001 - September 2002], more cases than ever
had been received."  The torture occurs rarely in the
prisons today, almost always in special safe houses
where the torture is conducted entirely in secret.

      . . . The report says, "[i]n many cases, suspects
believe they were detained only because they personally
knew those alleged to be fomenting rebellion, whether
from place of origin, school, living abroad, marriage,
or other relationship."  Women are often gang raped and
tortured today because of the activities of their male
relative, who according to gender norms in Ugandan
society, may often not inform the women of their
political activities.

      . . . <u>It appears likely that someone with Ms.
Kaweesa's history, who is deported from the United
States to Uganda would likely be detained and arrested
immediately upon their return, especially given the
large number of agencies involved in torture in Uganda
and the large increase in arrests today.  It is likely
that one or more government agents would be working at
the Uganda airport and be prepared to intercept her on
her return.  She will likely not have the opportunity
to flee to another part of Uganda, and even if she did,
she would not be safe.</u>

<u>Id.</u> Ex. 2.4, ¶¶ 6-10 (alteration in original) (emphasis added).

According to Professor Feldman's assessment and recommendation:

      [I]t is evident that Ms. Kaweesa will likely be
      detained, arrested, and tortured and/or raped if she is
      returned to Uganda.  While it is highly unlikely that

11

her activism in women's rights or in her church -
standing alone - has had, or would have, an effect on
how the government agents mistreat her, there is no
question that her status as the wife of someone who was
perceived as a political opponent is sufficient to
explain her persecution.  The evidence demonstrates
that family members of perceived political opponents
are routinely targeted in Uganda, regardless of whether
they participate in the activities of their family
members.  Moreover, it is reasonable to believe that
Ms. Kaweesa's relationship to her husband caused the
government to impute her husband's political activities
and opinions to her, and that her continuing to preach
about women's rights - combined with her relationship
to her husband - increased the risk that government
security forces would view her as politically
threatening.  <u>In my professional opinion, it is far
more likely than not that she would be tortured, raped,
and beaten again if she returns to Uganda at this time.</u>

<u>Id.</u> ¶ 11 (emphasis added).

The State Department report supports Professor Feldman's
assessment.  According to the State Department, "[w]hile civilian
authorities maintained effective control of the security forces,
there were frequent instances in which elements of the security
forces acted independently of government authority.  Members of
the security forces committed numerous serious human rights
abuses."  Pet. Ex. 2.3 (copy of Bureau of Democracy, Human
Rights, and Labor, <u>Country Reports on Human Rights Practices -
2003: Uganda</u>, <u>at</u>
http://www.state.gov/g/drl/rls/hrrpt/2003/27758.htm).  The report
stated that "[t]he [Ugandan] Government's human rights record
remained poor," noting that "[s]ecurity forces committed unlawful
killings[,] . . . were responsible for short-term

12

disappearances[, and] . . . were responsible for incommunicado
detention." Id.  "Torture by security forces and beating of
suspects to force confessions were serious problems," as were
"[a]rbitrary arrests and detention, including those of opposition
politicians and their supporters." Id.  "During the year, there
were credible reports that persons died as a result of torture by
the security forces." Id.

    Human Rights Watch's report, State of Pain: Torture in
Uganda, which Professor Feldman discusses at some length in his
affidavit, provides an even grimmer assessment of the reality in
Uganda than the State Department report.  Human Rights Watch
describes "what most victims consider a state-sanctioned campaign
of political suppression," involving "illegal and arbitrary
detention and unlawful killing/extrajudicial executions, and
using torture to force victims to confess to links to the
government's past political opponents or current rebel groups."
Pet. Ex. 2.2 (copy of Human Rights Watch, State of Pain: Torture
in Uganda) [hereinafter "Human Rights Watch"], at 4.  The report
describes torture, robbery, theft, sexual abuse, and rape carried
out in unacknowledged safe houses and army barracks, as well as
attempts to conceal the identity of detaining officers, who are
often out of uniform. Id. at 5.

    As for Kaweesa's claims about her activities while she lived
in Uganda, her description of her ministry in Uganda is confirmed

13

by her affidavit and declaration.  Further support comes from an April 9, 2004 affidavit of Reverend Baker Katende, who had a ministry in Kampala in the 1980's, through which he met Kaweesa and her husband, and who now serves as Pastor of the Global Evangelical Church of Waltham, Massachusetts.  Pet. Ex. 2.6. Reverend Darius Twa, Pastor of the All Nations Christian Center in Lowell, Massachusetts, has also known Kaweesa since she was performing her ministry in Uganda.  Id. Ex. 2.7 (Twa Declaration).  Each pastor describes her continued zeal in serving his respective church's women's, children's, and music ministries.  Id. Exs. 2.6, 2.7.

Kaweesa also submitted medical evidence that she suffers from Post Traumatic Stress Disorder (PTSD), chronic, moderate Major Depressive Disorder (MDD), and anxiety, that she did at the time of her initial hearing, and that her mental disorders likely contributed to her misremembering of the hearing date.  This evidence thus both corroborated her claim that she was raped and beaten, and tended to explain why she missed her hearing.

The diagnosis comes from Dr. Michael Alan Grodin.  He is a licensed physician, serving as an attending physician in the division of Psychiatry at Boston Medical Center, and is the director of the Law, Medicine, Ethics, and Human Rights Program and Professor of Psychiatry, Health Law, and Socio-Medical Sciences and Community Medicine at the Boston University Schools

14

of Medicine and Public Health, where he has been on the faculty for 25 years.  4/12/04 Grodin Aff. ¶ 2.  He has provided health care for refugee populations, including survivors of torture, for over 25 years, and he co-founded and co-directs the Boston Center for Refugee Health and Human Rights, a multidisciplinary program that provides comprehensive care to survivors of torture and refugee trauma.  Id.  The program has been recognized for its achievements, and receives federal and United Nations funding. Id.  He is widely published on many subjects, including torture and refugee health, he has extensive professional, educational, and research experience caring for refugees and torture survivors, and he has received recognition for his contributions. Id. ¶¶ 3-10.

Dr. Grodin examined Kaweesa on April 8, 2004.  Id. ¶ 11. Based on his interview with her, he determined that this was "Kaweesa's first evaluation to determine the extent of her mental health sequelae of torture and ill treatment."  Id. ¶ 13. According to Dr. Grodin:

> Ms. Kaweesa has symptoms which include helplessness and hopelessness.  Ms. Kaweesa has on several occasions had daydreams so vivid that she thinks she is being tortured again (flashbacks).  She avoids activities, actions or thoughts that in some way may resemble her trauma.  She has problems falling asleep and maintaining sleep and has frequent frightening nightmares.  She continues to feel on edge and is hyper vigilant.  She finds it very difficult to trust people. She feels emotionally numb and has difficulty concentrating.  Ms. Kaweesa often feels detached and

suffers from a restricted range of affect and anhedonis.

Id. ¶ 22.  Dr. Grodin noted that she had used alcohol frequently during her first two years in the United States, but denied on-going alcohol abuse and denied any past or current drug abuse. Id. ¶ 24.  He also noted a depressed and anxious affect, and that although she had contemplated suicide in the past, she had no present suicidal ideation.  Id. ¶ 26.

Dr. Grodin's examination found that Kaweesa suffered from anxiety, chronic, moderate MDD, and chronic PTSD.  Id. ¶¶ 28, 31. Dr. Grodin administered the Hopkins Symptom Checklist (HSC) for depression and anxiety; scores equal to or greater than 1.7 indicate that an individual is symptomatic, and Kaweesa scored 2.5 for both anxiety and depression.  Id. ¶ 27.  He administered the Post Traumatic Disorder Symptom Checklist, for which scores equal to or greater than 2.5 indicate that an individual is symptomatic, and Kaweesa scored 3.0.  Id.

According to Dr. Grodin, "PTSD is a group of symptoms that individuals experience after being exposed to extremely traumatic experiences such as combat experience, physical, mental or sexual torture, and major natural catastrophes."  Id. ¶ 29.  It occurs with 60-70% frequency among torture survivors, as compared to 3-7% in the general population.  Id.  Diagnosis rests solely on clinical evaluation, and Kaweesa presents all the criteria to define PTSD.  Id.  Depression, which is also diagnosed solely

based on clinical evaluation, "is a condition characterized by sadness and lack of energy (anhedonia)," and Kaweesa presents all the criteria to define Major Depressive Disorder (MDD).  Id. ¶ 30.

Dr. Grodin concluded that Kaweesa "presents a story consistent with being physically, mentally, and sexually tortured," that "her symptom complex is what one might expect of someone exposed to trauma," and that "[h]er presentation is not unlike other torture survivors and rape victims I have examined over the last 25 years of medical practice caring almost exclusively for immigrants and refugees at an inner city hospital and clinic."  Id. ¶ 32.  He recommended medication, psychotherapy, and a "safe and non-threatening environment that will promote psychological rehabilitation."  Id. ¶ 34.

In describing the effects of her disorders, he observed that "[s]he has sadness, anhedonia, ruminations, avoidance, flashbacks, and dissociations all of which significantly impact on her thought process and acts of daily living."  Id. ¶ 33.  Of particular importance, he noted that "[s]uch symptoms frequently interfere with memory," and that "[m]emory los[s] can lead to contemporary problems with concentration as well as remote problems in memory details."  Id.  More specifically:

> Upon arrival in the U.S. [Kaweesa] was culturally
> unfamiliar with the U.S. medical and legal systems.
> She was fearful of what might happen to her in the U.S.
> She has a past history of trauma.  Upon arrival in the

        U.S. she was isolated and depressed.  All of these
        factors can explain her initial delay in filing her
        asylum claim.  These factors could also contribute to
        her forgetfulness and misremembering the date of her
        master hearing.

Id. ¶ 33.

        While the BIA was considering her Motion to Reopen, Kaweesa
filed a motion to stay deportation with this Court on March 12,
2004, seeking a temporary restraining order to prevent removal
before the BIA could rule on her case. [Doc. No. 1]. On March 17,
2004, after a hearing, the Court denied the motion as moot and
administratively closed the case, with the understanding that
either party could reopen the case, and that the government would
inform the Court within seven days before any scheduled removal.
Order for Closure [Doc. No. 2].  On March 31, 2004, the
government notified the Court that removal had been scheduled for
April 21, 2004.  Notice of Scheduling of Removal [Doc. No. 8].
On April 16, 2004, Kaweesa then moved to reopen the case [Doc.
No. 9] and filed the habeas petition that is currently before the
Court [Doc. No. 10], seeking a preliminary injunction to stay
removal.  After a hearing on April 20, 2004, the court allowed
the motion to reopen the case, and the government agreed to
withhold deportation for two weeks, in order to permit the BIA to
reach its decision.

        The BIA denied Kaweesa's Motion to Reopen on May 3, 2004.
Resp't's Notice of Decision [Doc. No. 12].  The BIA held that the

18

motion was untimely and numerically barred under 8 C.F.R. §

1003.2(c)(2), which only permits one motion to reopen. Id. Ex.

(copy of BIA decision) [hereinafter "5/3/04 BIA Order"], at 1.

It further stated that there was "no reasonable explanation

offered as to why the relevant documentary evidence and the

attached affidavits could not have been previously discovered and

presented in a timely manner pursuant to the regulations." Id.

(citing INS v. Abudu, 485 U.S. 94 (1988), and 8 C.F.R. §

1003.2(c)(1)). Thus, Kaweesa's motion did not fall within the

time and numerical limits exception of 8 C.F.R. §

1003.2(c)(3)(ii). Id. The BIA also denied the motion in the

exercise of discretion, noting that "[m]otions to reopen are

disfavored" and that the BIA has "broad discretion" to grant or

deny them. Id. at 2 (citing INS v. Doherty, 502 U.S. 314, 322-23

(1992), and INS v. Rios-Pineda, 471 U.S. 444, 449-50 (1985)).

Kaweesa has not appealed the BIA's decision to the First Circuit.

The government again scheduled Kaweesa for removal, and at a

May 11, 2004 hearing, this Court stayed deportation[3] and asked

for further briefing on several issues. The Court also permitted

Dufresne to withdraw from the case.

On June 1, 2004, the Court requested information from the

parties regarding when, if ever, Kaweesa had been informed of her

---

[3] The Court applied the four-part algorithm for preliminary
injunctions in deciding that a stay was appropriate. See Arevalo
v. Ashcroft, 344 F.3d 1, 9 (1st Cir. 2003).

right to appeal to the BIA and to the First Circuit. [Doc. No.
16].  Kaweesa submitted an affidavit stating that she did not
remember any government official ever informing her of her rights
to appeal the hearing officer's refusal to reopen her case to the
BIA and ultimately to the First Circuit. 6/7/04 Kaweesa Aff. ¶
32.  The government acknowledges that there is no evidence that
any government official has ever informed her of her rights to
appeal.  Resp'ts Filing in Response [Doc. No. 18], ¶¶ 2, 4.
Kaweesa admitted that Almondel informed her that she had 90 days
from the time of the BIA's summary affirmance of that decision to
appeal, but she assumed that he had in fact filed her appeal, and
it appears from her affidavit that she understood the appeal to
be to the BIA again, not to the First Circuit.  6/7/04 Kaweesa
Aff. ¶ 33.  Broderick apparently informed Kaweesa of her right to
appeal the BIA's denial of her second motion to reopen, and
Dufresne informed her of her right to appeal the BIA's denial of
her third motion to reopen.  See Resp'ts Filing in Response ¶ 3;
id. Ex. 1 (printouts of emails from Dufresne); Resp'ts Mem. Ex. 9
¶¶ 5-6.[4]

---

[4] As it turns out, the government's failure to inform
Kaweesa of her appeal rights does not impact the resolution of
this case.  The Court therefore has no occasion to determine
whether failure by the government to inform an alien proceeding
pro se of her rights to appeal to the BIA and the First Circuit.
Whatever the answer to the legal question, it certainly seems
like a good idea to put boilerplate language about appeal rights
in all administrative orders in immigration cases.

On June 14, 2004, this Court again sought briefing from the parties on the significance, if any, that Almondel's misconduct and the government's failure to inform Kaweesa of her appeal rights should have on the Court's decision.  Kaweesa's new attorney filed a brief, as did the government, and the case is now ripe for decision.

To summarize this case's history to date:

Aug. 2, 1994    Kaweesa enters the United States on a B Visa.

Feb. 22, 1999   Kaweesa's pro se application is referred to a
                hearing officer.

May 13, 1999    Hearing officer enters order of removal in
                absentia.

May 19, 1999    Kaweesa files unopposed pro se Motion to Reopen.

June 23, 1999   The hearing officer denies the Motion to Reopen.

2001            Kaweesa learns of her son's beating.

May 6, 2002     The BIA affirms the hearing officer's 6/23/99
                order without opinion.

June/July 2002  Almondel misrepresents to Kaweesa that he has
                filed an appeal on her behalf

Apr. 2003 Kaweesa discovers Almondel's fraud, retains Broderick

June 17, 2003   Kaweesa is taken into custody

July 25, 2003   Kaweesa files a Motion to Reopen with BIA

Nov. 12, 2003   The BIA denies the Motion to Reopen.  Broderick
                withdraws, discouraging Kaweesa from appealing.

ca. Mar. 2004   Kaweesa consults Dufresne.

Apr. 15, 2004   Kaweesa files a new Motion to Reopen with the BIA.

Mar. 12, 2004   Kaweesa moves the Court to stay removal.

21

Mar. 17, 2004    The Court denies the motion to stay as moot and administratively closes the case.

Apr. 16, 2004    Kaweesa moves the Court to reopen the case, files habeas petition, requests stay of removal.

Apr. 20, 2004    The Court reopens the case and stays removal.

May 3, 2004    The BIA denies Kaweesa's Motion to Reopen.

May 11, 2004    The Court stays removal, pending resolution of Kaweesa's habeas petition.  Dufresne withdraws.

May 28, 2004    The Court requests further information to be submitted by June 7, 2004

June 14, 2004    The Court requests further briefing.

## II.    DISCUSSION

### A.    General Limitations on Habeas Jurisdiction in Immigration Cases

#### 1.    Types of Claims and Scope of Review

Kaweesa's petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenges her removal order and the refusals of the hearing officer and the BIA to reopen her case.  Although challenges to the legality of executive detention are at the historical core of the Great Writ, aliens have also long been able to test the legality of deportation orders by bringing habeas corpus actions.  See INS v. St. Cyr, 533 U.S. 289, 301-08 (2001) (citing cases and sources); Saint Fort v. Ashcroft, 329 F.3d 191, 197 (1st Cir. 2003) (citing sources).  In fact, for most of this nation's history, habeas corpus actions were the only means for challenging deportation orders.  See id. at 306.

22

As a general matter, habeas courts do not have jurisdiction
to exercise plenary review of executive branch decisions
regarding aliens.[5]  The scope of habeas review is narrower than
that of ordinary judicial review.  Heikkila v. Barber, 345 U.S.
229, 236 (1953).  The Supreme Court has made clear that habeas
review is appropriate for claims that detention or removal is
"based on errors of law, including the erroneous application . .
. of statutes."  St. Cyr, 533 U.S. at 302.  Although "pure
issue[s] of law" fall within the scope of habeas review, id. at
300, 304-05, 308; Goncalves v. Reno, 144 F.3d 110, 113 (1st Cir.
1998), the First Circuit acknowledges that "[t]he entire content
of that phrase has not been worked out."  Saint Fort, 329 F.3d at
203.

Although the First Circuit has not reached the issue, it has
noted the Second Circuit's view "that habeas jurisdiction
encompasses at least the situation in which what is at stake is
the BIA's application of legal principles to undisputed facts."
Id. at 203 (citing Wang v. Ashcroft, 320 F.3d 130, 143 (2d Cir.
2003).  The First Circuit has held that habeas review extends to

_____

[5] Congress recently abolished the Immigration and
Naturalization Service ("INS") as an independent agency within
the Department of Justice and transferred its functions to the
newly established Department of Homeland Security.  See Homeland
Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135,
2205 (codified as amended at 6 U.S.C. § 291(a)) (2002).  The INS
functions relevant to this case, including the adjudication of
asylum claims, now reside in the Bureau of Citizenship and
Immigration Services within the Department of Homeland Security.

claims under the Constitution or based on construction of
statutes or regulations, and that although habeas courts can
determine whether an alien is eligible for a particular form of
discretionary relief, they cannot review an agency's exercise of
its discretion.  <u>Saint Fort</u>, 329 U.S. at 203, and cases cited;
<u>see also</u> <u>Lopez</u> v. <u>Ashcroft</u>, 267 F. Supp. 2d 150, 152-53 (D. Mass.
2003).  Moreover, habeas will lie to determine whether the
executive branch's factual determinations are based on "some
evidence."  <u>See</u> <u>United States ex rel. Vajtauer</u> v. <u>Comm'r of
Immigration of New York</u>, 273 U.S. 103, 106 (1927) (stating
"[d]eportation without a fair hearing or on charges unsupported
by any evidence is a denial of due process which may be corrected
on habeas corpus. . . . Upon a collateral review in habeas corpus
proceedings, it is sufficient that there was some evidence from
which the conclusion of the administrative tribunal could be
deduced and that it committed no error so flagrant as to convince
a court of the essential unfairness of the trial."); <u>Eugene</u> v.
<u>INS</u>, No. Civ. A. 02-10488-GAO, 2003 WL 40509, at *3 (D. Mass.
Jan. 3, 2003) (O'Toole, J.); <u>but see</u> <u>Sawan</u> v. <u>Farquaharson</u>, No.
Civ. A. 02-10959-RGS, 2002 WL 1465771, at *1 (D. Mass. July 8,
2002) (Stearns, J.) (stating that the scope of habeas review does
not include factual determinations by the INS).  Still, this
Court has followed the Second Circuit holding "that where review
of the merits of a habeas petitioner's claim would necessitate

the 'reassessment of the evidence' before the Immigration Judge and the Board, habeas jurisdiction does not attach." Lopez, 267 F. Supp. 2d at 153 (quoting Sol v. INS, 274 F.3d 648, 651 (2d Cir. 2001)).

### 2.    Statutory Limitations

Congress has some power to limit the availability of habeas review, within constitutional limits.  See St. Cyr, 533 U.S. at 314 (noting that interpreting 8 U.S.C. § 1252 to preclude habeas review in the case before the court would be less constitutionally problematic if the petitioner had some other means of obtaining judicial review of questions of law); Swain v. Pressley, 430 U.S. 372, 381 (1977) (holding, in regard to a statute that vested collateral review of District of Columbia local court convictions solely in the local court system, "that the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus").  The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), enacted on September 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009-546, substantially amended the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 et seq., and this Court must determine what impact the IIRIRA has, if any, on its habeas jurisdiction.

25

#### a.    Availability of Review in the Courts of Appeals

Under 8 U.S.C. § 1252(a)(1), "[j]udicial review of a final order of removal . . . is governed only by chapter 158 of Title 28 [codified at 28 U.S.C. §§ 2341-51, giving circuit courts of appeals exclusive jurisdiction to review decisions of administrative agencies], except as provided in subsection (b) of this section . . . ."  Under one possible interpretation of section 1252, the exclusive avenue for judicial examination of orders of removal is through appeal of those orders to a court of appeals.  The First Circuit has yet to determine whether the IIRIRA permits habeas review in cases where direct review of a BIA decision is available.  See Seale v. INS, 323 F.3d 150, 154 (1st Cir. 2003).  As the Court discusses below, however, the First Circuit has suggested that, at a minimum, there are strict limits on the use of habeas for claims that are amenable to direct review.  See Foroglou v. Reno, 241 F.3d 111, 114-15 (1st Cir. 2001).

#### (1)  The Relevant Provisions

Several "[r]equirements for review of orders of removal" are imposed by 8 U.S.C. § 1252(b).  First, "[t]he petition for review must be filed not later than 30 days after the date of the final order of removal."  8 U.S.C. § 1252(b)(1).  Moreover, several provisions make clear that "review" is only contemplated in the court of appeals.  See, e.g., id. § 1252(b)(2) ("The petition for

26

review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings."); id. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based[.]"); id. §§ 1252(b)(5)(A)-(B).

Although the statute clearly contemplates that habeas petitions regarding an order of removal will sometimes lie, see id. §§ 1252(c), (e)(2), several provisions create difficult questions as to when habeas will lie.  Section 1252(g) states that:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Section 1252(b)(9) provides that:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

Id.[6]  The phrase "judicial review of a final order under this section" apparently refers back to section 1252(a)(1), which only

---

[6] The subchapter referenced is Subchapter II ("Immigration") of Chapter 12 ("Immigration and Nationality") of Title 8 ("Aliens and Nationality").

permits such review in the courts of appeals.  At first glance,
taken together, these provisions suggest that in any cases where
an individual's claim could be addressed on direct review of a
BIA decision through appeal to the court of appeals, such review
is the exclusive remedy, and habeas review under 28 U.S.C. § 2241
is unavailable.

Adding to the confusion, in one place section 1252 could be
interpreted to treat habeas review as a subclass of "judicial
review," but in another it treats "judicial review" and "habeas
corpus actions" as separate concepts.  Section 1252(e)(2)
provides that "[j]udicial review of any determination made under
section 1225(b)(1) of this title is available in habeas corpus
proceedings"; review in the courts of appeals is otherwise
unavailable for actions relating to section 1225(b)(1), which
governs removal of non-asylum-seeking aliens who attempt to gain
entry through fraud or without valid documentation.  8 U.S.C. §
1252(a)(2)(A).  In contrast, section 1252(c) describes the
requirements for "[a] petition for review or for habeas corpus,"
treating "review" and "habeas corpus" as separate concepts.

### (2)  The Significance of <u>INS</u> v. <u>St. Cyr</u>

Interpretation of the relevant statutory language is further
complicated by <u>INS</u> v. <u>St. Cyr</u>.  In that case, the INS argued that
sections 1252(a)(1), 1252(a)(2)(C), and 1252(b)(9) jointly
precluded habeas review for certain criminal aliens, even though

that would leave them without any access to judicial review of INS administrative action whatsoever.[7]  St. Cyr, 533 U.S. at 310-11.  These provisions focused on the terms "judicial review" and "jurisdiction to review."  St. Cyr, 533 U.S. at 311.

The Supreme Court held that these provisions did not preclude habeas review under 28 U.S.C. § 2241, because the terms "judicial review" and "jurisdiction to review" did not include habeas review.  The Supreme Court noted that "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings," St. Cyr, 533 U.S. at 311, but largely justified its interpretation by reference to several canons of construction.  These canons included: (1) "the strong presumption in favor of judicial review of administrative action," id. at 298; (2) "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," id.; (3) the presumption against repeals by implication, id. at 299 & n.11; (4) the general rule that "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended the

---

[7] Section 1252(a)(1), quoted supra, confines "judicial review" to courts of appeals.  Section 1252(a)(2)(C) states that "no court shall have jurisdiction to review any final order of removal" against certain criminal aliens.  Id.  Section 1252(b)(9), quoted supra, restricts "[j]udicial review of all questions of law and fact" relating to acts or proceedings to remove an alien to "judicial review of a final order under this section."  Id.

result," id. at 299; and (5) the "constitutional avoidance"
canon, id. at 299-300.  In particular, the complete elimination
of all judicial review, habeas or otherwise, of a "pure question
of law" would raise serious constitutional questions under the
Suspension Clause, U.S. Const. art. I, § 9, cl. 2.  Id. at 300.

      Unlike the petitioners in St. Cyr, however, noncriminal
aliens like Kaweesa are permitted to appeal BIA decisions to the
court of appeals.  Under Swain, "the substitution of a collateral
remedy which is neither inadequate nor ineffective to test the
legality of a person's detention does not constitute a suspension
of the writ of habeas corpus."  430 U.S. at 381.  There is
nothing "inadequate or ineffective" about direct review by the
court of appeals -- the court of appeals is actually empowered to
engage in a more searching review than a habeas court -- so the
Constitution would almost certainly permit Congress to repeal
habeas jurisdiction for claims that could be raised on direct
review in the courts of appeals.  See Swain, 430 U.S. at 381;
Saint Fort, 329 F.3d at 203.  Thus the presumption in favor of
judicial review, the constitutional avoidance canon, and the rule
requiring a clear statement of congressional intent to legislate
to the outer limits of Congress's power do not apply in cases
involving noncriminal aliens.

      Although the St. Cyr court suggested that it "might" be
permissible to interpret the limitations on "judicial review" to

apply to habeas review when direct review is available, 533 U.S. at 313-14, there are a number of reasons not to do so. First, the St. Cyr court did state that "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings." Id. at 311. Although this statement of the legal background against which Congress legislated is arguably dicta, it is both instructive and true. Second, two of the canons that the St. Cyr court invoked, the presumption against repeals of habeas jurisdiction and the presumption against implied repeals, apply even in the case of noncriminal aliens. Third, it is awkward to interpret a term in a statutory provision one way in some cases, and another way in other cases. See Xi v. INS, 298 F.3d 832, 839 (9th Cir. 2002) ("The government has offered no authority suggesting that a litigant may not take advantage of a statutory interpretation that was guided by the principle of constitutional avoidance when that litigant's case does not present the constitutional problem that prompted the statutory interpretation."); see also Rosales-Garcia v. Holland, 322 F.3d 386, 406 (6th Cir. 2003) (quoting the above passage from Xi with approval); cf. Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (noting that it is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (quoting Department of Revenue of Oregon v. ACF Indus., Inc., 510 U.S. 332, 342 (1994))

31

(internal quotation marks omitted)).  This last rationale has particular force in immigration law, which is complex enough without multiplying meanings, and where petitioners typically are pro se, do not speak English as a first language, have diminished constitutional protections as compared to citizens, and have a great deal at stake.

This Court therefore holds that the provisions in 8 U.S.C. § 1252 limiting "judicial review" to direct review in the courts of appeals do not foreclose habeas jurisdiction in the district courts.[8]  As the Court will explain below, however, significant prudential limitations on the exercise of habeas jurisdiction exist.

While the Court had this case under advisement, the First Circuit issued its decision in Sayyah v. Farqharson, 382 F.3d 20 (1st Cir. 2004), which held that the exhaustion requirement in 8 U.S.C. § 1252(d) applies to habeas cases.  382 F.3d at 24.  The First Circuit did not, however, consider whether the rest of section 1252 applies to habeas cases.

The First Circuit rejected an argument based on INS v. St. Cyr, because the case before it involved a noncriminal alien who had access to review in the courts of appeals.  See Sayyah, 382

---

[8] Other courts have taken this approach.  See, e.g., Riley v. INS, 310 F.3d 1253, 1256 (10th Cir. 2002); Liu v. INS, 293 F.3d 36, 37 (2d Cir. 2002); Chmakov v. Blackman, 266 F.3d 210, 215 (3d Cir. 2001).

F.3d at 24-25.  The First Circuit does not appear to have
considered St. Cyr's emphasis on the historically distinct
meanings of "judicial review" and "habeas corpus" in immigration
law, however, even though that consideration would apply in cases
involving noncriminal aliens.  See id.  In any case, the
presumption against repeals of habeas jurisdiction, and the
presumption against implied repeals, both discussed in St. Cyr,
apply to the availability of habeas review under section 1252
generally, but they would not apply to the exhaustion requirement
in section 1252(d) specifically.  It may well be that this
difference would compel the First Circuit to hold that although
section 1252(d) applies to habeas cases, habeas review is
available under section 1252, even to noncriminal aliens.

        The First Circuit also declined to apply the presumption
that "identical words or terms used in different parts of the
same act are intended to have the same meaning."  Id. at 26 n.6
(quoting United States v. Nippon Paper Indus. Co., Ltd., 109 F.3d
1, 4 (1st Cir. 1997)) (internal quotation marks omitted).  Even
if that presumption was not enough to tip the scales on the
interpretation of 1252(d), however, that does not mean that it is
without significance in interpreting section 1252 generally.  It
is appropriate for the Court to rely on it here where, in concert
with other considerations not present in the context of section

1252(d) specifically, it justifies interpreting "judicial review" to exclude "habeas corpus."

Perhaps most telling, though, is the fact that the First Circuit appears to have assumed that habeas jurisdiction existed for the noncriminal alien before it, despite its holding that section 1252(d) applies to habeas cases.  In the absence of contrary authority, then, this Court holds that Sayyah does not undermine this Court's conclusion with respect to the availability of habeas review under section 1252.

### b.   Exhaustion

"Review" under section 1252 is subject to an exhaustion requirement.  Pursuant to 8 U.S.C. § 1252(d):

A court may review a final order of removal only if --

(1) the alien has exhausted all administrative remedies available to the alien as of right, and

(2) another court has not decided the validity of the order unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

Id.

It is possible to interpret this provision as imposing an exhaustion requirement on habeas petitions as well.  The Court had originally decided to leave this question unresolved, because even if the statutory exhaustion requirement did not apply to habeas review, a judicially-created exhaustion requirement would

34

apply.  Although there are differences between the two kinds of
exhaustion requirements, none of those differences mattered in
resolving this case.

As has already been discussed, the First Circuit held in
Sayyah that section 1252(d) applies to habeas corpus cases.
Though that decision is obviously binding, the Court deems it
appropriate to explain why it considered this question to be such
a difficult one.  In both immigration and habeas corpus law, a
dialogue between judges is especially helpful in settling
outstanding issues.  The two are among the most complicated areas
of doctrine in our legal system.  Both are procedural minefields.
Immigrants and habeas petitioners navigating these intricate
doctrinal mazes often proceed pro se, or are represented by
counsel who, though of excellent quality, must handle a large
number of cases with limited resources.  Many immigrants also
have limited ability even to speak English.  With these
considerations in mind, the Court turns to the question at hand.

Although the Court has held that the term "judicial review"
in section 1252 does not encompass habeas review, section 1252(d)
refers more generically to "review," and one might ascribe some
significance to the absence of the word "judicial."  Indeed, of
the circuits to address the question whether section 1252(d)'s
exhaustion requirement extends to habeas petitions, most have
held that it does.  See Sayyah, 382 F.3d at 24; Theodoropoulos v.

35

INS, 358 F.3d 162, 170-71 (2d Cir. 2004) (superceding an earlier opinion, 313 F.3d 732 (2002)); Duvall v. Elwood, 336 F.3d 228, 231 n.5 (3d Cir. 2003); Sundar v. INS, 328 F.3d 1320, 1324-25 (11th Cir. 2003); Kurfees v. INS, 275 F.3d 332, 336 (4th Cir. 2001) (holding that a similar requirement under the previous immigration regime applied to habeas).  But see Noriega-Lopez v. Ashcroft, 335 F.3d 874, 880 & n.4 (9th Cir. 2003) (refusing to reach the question).

    A contrary argument exists, however.  In holding that the terms "judicial review" and "jurisdiction to review" do not include habeas review, this Court held that section 1252 is primarily concerned with direct review in the courts of appeals. Moreover, section 1252(c) discusses the requirements "for review or for habeas corpus of an order of removal," treating "review" and "habeas corpus" as separate concepts.  Looking at section 1252 as a whole, it appears that when Congress wanted to apply a provision to habeas corpus, it knew how to do so explicitly. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  Therefore, Congress' failure explicitly to apply section 1252(d) to habeas corpus suggests that the provision should only apply to direct review in the

36

courts of appeals.  It does not appear that this argument was
presented to the <u>Sayyah</u> court.

Unfortunately, section 1252(d)'s pre-IIRIRA incarnation, 8
U.S.C. § 1105a(c) (repealed 1996) does not shed much additional
light on this question.  It provided that:

> An order of deportation or of exclusion shall not be
> reviewed by any court if the alien has not exhausted
> the administrative remedies available to him as of
> right . . . .  Every petition for review or for habeas
> corpus shall state whether the validity of the order
> has been upheld in any prior judicial proceeding . . .
> .  No petition for review or for habeas corpus shall be
> entertained if the validity of the order has been
> previously determined in any civil or criminal
> proceeding, unless the petition presents grounds which
> the court finds could not have been presented in such
> prior proceeding, or the court finds that the remedy
> provided by such prior proceeding was inadequate or
> ineffective to test the validity of the order.

On the one hand, this previous version explicitly differentiated
between "review" and "habeas corpus," so the current version's
failure to do so suggests an intent by Congress not to apply the
exhaustion requirement to habeas petitions.  On the other hand,
the provision can be read to treat the noun "review" as
encompassing only direct review, and the verb "review" to
encompass both habeas corpus and direct appeals from the BIA.
This would suggest that the verb "review" in section 1252(d) also
encompasses both.

This Court originally thought that it was not necessary to
decide whether the statutory exhaustion requirement extends to
habeas corpus review, because even if it did not, a common law

37

exhaustion requirement would apply.  It is well settled that in federal habeas cases appealing state court convictions, a prudential exhaustion requirement exists.  <u>E.g.</u>, <u>Granberry</u> v. <u>Greer</u>, 481 U.S. 129, 131 (1987); <u>Ex parte Royall</u>, 117 U.S. 241, 251 (1886) (creating the doctrine).  The same sort of prudential doctrine exists in immigration cases, absent a relevant statutory requirement.  <u>See</u> <u>United States</u> v. <u>Sing Tuck</u>, 194 U.S. 161, 167-68 (1904) (Holmes, J.) (requiring alleged alien to exhaust administrative remedies before seeking habeas relief, despite absence of any statutory exhaustion requirement); <u>Bustos-Ovalle</u> v. <u>Landon</u>, 225 F.2d 878, 880 (9th Cir. 1955); <u>see also</u> <u>Castro-Cortez</u> v. <u>INS</u>, 239 F.3d 1037, 1047 (9th Cir. 2001) (discussing the Ninth Circuit's imposition of a prudential exhaustion requirement in habeas cases under 28 U.S.C. § 2241); <u>Arevalo</u> v. <u>Ashcroft</u>, 344 F.3d 1, 16 (1st Cir. 2003) (citing <u>Castro-Cortez</u> v. <u>INS</u> with approval, and suggesting that the district court acted properly in refraining from ruling on a petitioner's habeas claims until the court of appeals ruled on the claims over which the court of appeals had exclusive jurisdiction); <u>Rivera-Martinez</u> v. <u>Ashcroft</u>, No. 03-2032, 2004 WL 247417, at *2 (1st Cir. Nov. 4, 2004) (affirming the district court's ruling that the alien could not "use habeas to resurrect a claim that could have and should have been presented on direct review"); <u>Hernandez</u> v. <u>Reno</u>, 238 F.3d 50, 55 (1st Cir. 2001) (applying a prudential exhaustion

38

requirement to aliens' ineffective assistance of counsel claims); <u>Mattis</u> v. <u>Reno</u>, 212 F.3d 31, 41 (1st Cir. 2000), <u>overruled on other grounds by</u> <u>St. Cyr</u>, 533 U.S. at 325-26 ("Traditional rules regarding exhaustion and waiver govern on direct review of BIA orders.  We see no reason why the same should not hold on habeas review, which we have suggested is less broad than direct review.").[9]

The judge-made exhaustion requirement is prudential, not jurisdictional, and can be waived in certain circumstances. <u>Beharry</u> v. <u>Ashcroft</u>, 329 F.3d 51, 56-59, 62 (2d Cir. 2003)(discussing the differences between judicial and statutory exhaustion doctrines).  These circumstances include situations when: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question."  <u>Beharry</u>, 329 F.3d at 62 (quoting <u>Able</u> v. <u>United States</u>, 88 F.3d 1280, 1288 (2d Cir. 1996)) (citations and internal quotation marks omitted).

Statutory exhaustion requirements are jurisdictional, however, and absent specified exceptions, probably the only

---

[9] Although <u>INS</u> v. <u>St. Cyr</u>, 533 U.S. 289, 325 (2001), superceded <u>Mattis</u> in some regards, it had no effect on this portion of <u>Mattis</u>.  <u>See</u> <u>Leitao</u> v. <u>Reno</u>, 311 F.3d 453, 455 (1st Cir. 2002).

exception that courts can impute is that the exhaustion requirement is waived "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." <u>Booth</u> v. <u>Churner</u>, 532 U.S. 731, 736 (2001); <u>see id.</u> at 741 n.6; <u>Sayyah</u>, 382 F.3d at 27-28 & n.8 (acknowledging this exception and entertaining the possibility that another exception exists where "prejudice may result from an unreasonable or indefinite timeline for administrative action"); <u>Beharry</u>, 329 F.3d at 58-59.

The <u>Sayyah</u> court's decision rested in part on a concern that unless section 1252(d) applied to habeas cases, immigrants would be able to seek habeas review without exhausting administrative remedies.  See <u>Sayyah</u>, 382 F.3d at 26.  The court stated:

> To hold otherwise would drastically limit the utilization of a salutary principle customarily applied in respect to administrative proceedings.  Such an interpretation would allow an alien subjected to an adverse decision to reject the very administrative review processes established to correct mistakes and to insist, instead, upon immediate access to a federal court.

<u>Id.</u>  The quoted language seems to suggest that the First Circuit did not recognize that a common law exhaustion requirement would apply to immigrant habeas cases, even if section 1252(d) does not.  Later in the opinion, however, the First Circuit demonstrates an awareness of the common law doctrine. See <u>Sayyah</u>, 382 F.3d at 28-29 ("As the statutory exhaustion requirement bars review, we need not consider how Sayyah's habeas

40

corpus petition fares under the common-law exhaustion standard."
(citing <u>Sousa</u> v. <u>INS</u>, 226 F.3d 28, 31 (1st Cir. 2000)). Thus,
the First Circuit appears to have rested not so much on a failure
to consider the common law doctrine, but rather on a belief that
the common law doctrine would frequently produce different
results than would section 1252(d). This Court is not persuaded
that this is so, although the common law doctrine obviously gives
courts somewhat greater flexibility at the margins to prevent
manifest injustice in cases where section 1252 might lead to a
different result.

The Court hopes that the dialogue surrounding these issues
will continue in this Circuit. The immigration statutes that
have been passed in the past decade present unique interpretive
challenges, and much remains unsettled. The Court considers the
proliferation of meanings of "review" and "judicial review" in
section 1252 to be an unfortunate development, though it may well
be the correct result, and hopes that exchange of views among
judges in this Circuit will ultimately minimize confusion in an
already complex area of the law.

Returning to the specific issues in this case, there is no
dispute that Kaweesa has exhausted her administrative remedies.
The only possible argument to the contrary would be that appeal
to the First Circuit is an "administrative remedy" that she
failed to exhaust, but it would strain section 1252's plain

41

language to conflate judicial remedies and administrative
remedies.  Moreover, Congress knows how to impose judicial
exhaustion requirements when it wishes to, see 28 U.S.C. §§
2254(b)(1)(A), 2255, so it would be particularly inappropriate to
distort the plain meaning of the word "administrative" to include
"judicial."

### 3.  Prudential Limitations

Although section 1252(d) applies to habeas review, aliens
are only required to exhaust "administrative" remedies, not
judicial ones.  Thus, as the Court has described the regime so
far, there is nothing to prevent an alien from using habeas
review as a substitute for direct review by the court of appeals.

Aliens would not often have incentive to do so, given that
the scope of habeas review is narrower than the scope of direct
review, and that section 1252(d)(2) would in most cases prohibit
direct review once a habeas court had passed on an alien's claim.
Still, there might be cases where an alien failed to seek direct
review within 30 days of a BIA order, through an oversight or
through a desire to delay deportation.  Permitting habeas review
in all such cases would be inconsistent with the overall scheme
articulated in section 1252, which emphasizes administrative
efficiency, and with the IIRIRA in general, which was designed
"as a detailed and comprehensive plan to strengthen the
immigration laws."  Arevalo, 344 F.3d at 13 (citing Reno v.

42

American-Arab Anti-Discrimination Committee, 525 U.S. 471, 486 (1999), and Bartoszewska-Zajac v. INS, 237 F.3d 710, 712 (6th Cir. 2001)).

The answer to this difficulty does not lie within the statute itself. Rather, it lies in federal common law, that is, in the common law exhaustion requirement that serves as the default rule in habeas corpus, absent a statutory exhaustion requirement. Because the Great Writ is an extraordinary remedy, it should only be available when there is some compelling reason why an alien failed to raise her claim on direct review. See Castro-Cortez, 239 F.3d at 1047 (explaining that federal courts should exercise habeas jurisdiction only when all other judicial and administrative avenues have been exhausted); see also Arevalo, 344 F.3d at 16; Hernandez, 238 F.3d at 54-55 (citing McCarthy v. Madigan, 503 U.S. 140, 144 (1992), and Davis, Administrative Law § 15.2 (3d ed. 1994) ("[T]o the extent the Board does provide currently available remedies as a matter of grace, a court is free to require exhaustion of such remedies -- not because of any jurisdictional objection or statutory command but simply because it makes sense."). As a prudential matter, then, a court should not grant habeas relief unless a petitioner has exhausted all available administrative and judicial remedies. See Castro-Cortez, 239 F.3d at 1047.

As the Court has already described, under a prudential exhaustion regime, courts can consider unexhausted claims where: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." Beharry, 329 F.3d at 62 (quoting Able, 88 F.3d at 1288) (citations and internal quotation marks omitted). The first and fourth exceptions would apply in cases where due process violations have frustrated an alien's direct appeal. At least one judge in this District has held that habeas jurisdiction exists in such circumstances. See Kelly v. Farquharson, 256 F. Supp. 2d 93, 99 (D. Mass. 2003) (Saris, J.); see also Foroglou, 241 F.3d at 113 (assuming, without deciding, that a district court would have habeas jurisdiction in such circumstances); Chmakov v. Blackman, 266 F.3d 210, 215 (3d Cir. 2001) (holding that a district court had habeas jurisdiction over claim that petitioner was denied due process when his lawyer failed to file any brief before the BIA on appeal). By contrast, a challenge to a statute or regulation, which could ordinarily be raised on direct review before the First Circuit, would not ordinarily be subject to habeas review.

Applying a common law exhaustion requirement allows courts to restrict access to habeas corpus without doing violence to the

44

language of section 1252, and without interpreting that statute in a manner contrary to <u>St. Cyr</u>. It ensures that judicial oversight of the removal process will be prompt and efficient, but also provides a safety valve in cases where a stricter regime would lead to manifest injustice.

Application of a common law exhaustion requirement is also at least consistent with the First Circuit's decision in <u>Foroglou</u>, 241 F.3d 111. In that case, a noncriminal alien unsuccessfully appealed a deportation order to the First Circuit, then asked the BIA to reopen his case and more or less simultaneously filed a habeas petition to stay deportation. 241 F.3d at 112-13. The BIA refused to reopen the case, the district court dismissed the habeas petition, and the alien appealed both decisions to the First Circuit. <u>Id.</u> at 113.

The First Circuit affirmed the district court's dismissal, and strongly suggested that the district court had no habeas jurisdiction. <u>Id.</u> at 114-15. The First Circuit noted that it had assumed that habeas jurisdiction existed "for those who have <u>no other way</u> to present on direct review constitutional or other legal challenges to a final order of deportation" and "under restrictive conditions if a due process violation frustrated a deportee's right of direct appeal," but the court emphasized that the petitioner "has had full access to this court for direct review of orders leading to his deportation." <u>Id.</u> The First

45

Circuit did not squarely rest on these grounds, however, as it also noted that the claims raised in the habeas petition were moot. See id. at 115; but see Arloo v. Ashcroft, 238 F. Supp. 2d 381, 382-83 (D. Mass. 2003) (Ponsor, J.) (stating that Foroglou "indicated that a habeas corpus action filed after abandonment of an available statutory judicial review before the Court of Appeals is barred by 8 U.S.C. § 1252(d)"). The Foroglou opinion makes clear, however, that habeas should remain an exceptional remedy, and should not merely serve interchangeably with direct review. Even assuming that Foroglou survives St. Cyr completely intact, the former is as consistent with prudential exhaustion doctrine as it is with a more absolutist exhaustion doctrine.

**B.  Habeas Jurisdiction Over Specific Claims**

**1.  The Order of Removal in Absentia and the May 6, 2002 Denial of Kaweesa's First Motion to Reopen**

The Court notes at the outset that when the BIA affirms a hearing officer's decision without opinion, the Court treats the hearing officer's opinion as the BIA's own decision. Cf. Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003), and cases cited (treating summary affirmances by the BIA this way on direct review).

Under 8 U.S.C. § 1229a(b)(5)(A), an alien who fails to attend her hearing "shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the [required] written notice was so provided and

46

that the alien is removable (as defined in subsection (e)(2) of

this section)."  Subsection (e)(2) defines "removable" to mean,

"in the case of an alien that is not admitted to the United

States, that the alien is inadmissible under section 1182 of this

title," and "in the case of an alien admitted to the United

States, that the alien is deportable under section 1227 of this

title."

Kaweesa concedes that she failed to attend her hearing and

that she received the required notice.  Under 8 U.S.C. §

1227(a)(1)(B), she was present in the United States in violation

of the law.  Under 8 U.S.C. § 1229a(b)(5)(C):

Such an order may be rescinded only--

(i) upon a motion to reopen filed within 180 days
after the date of the order of removal if the alien
demonstrates that the failure to appear was because
of exceptional circumstances (as defined in
subsection (e)(1) of this section), or

(ii) upon motion to reopen filed at any time if the
alien demonstrates that the alien did not receive
notice in accordance with paragraph (1) or (2) of
section 1229(a) of this title or the alien
demonstrates that the alien was in Federal or State
custody and the failure to appear was through no
fault of the alien.

Section 1229a(e)(1) defines "exceptional circumstances" to mean

"exceptional circumstances (such as serious illness of the alien

or serious illness or death of the spouse, child, or parent of

the alien, but not including less compelling circumstances)

beyond the control of the alien."  The hearing officer held that

no exceptional circumstances justified Kaweesa's failure to attend her hearing.

The Court must now determine whether it has jurisdiction to review the hearing officer's June 23, 1999 denial of Kaweesa's motion to reopen and the BIA's May 6, 2002 summary affirmance. That means determining whether and to what extent these are the sorts of decisions that can be reviewed in habeas, and then determining whether Kaweesa meets the jurisdictional requirements for this Court to consider her claims.

### a.    The Nature of the Claim

The government first argues that review of these decisions is beyond the scope of the Court's habeas jurisdiction, because the decisions were discretionary.  The government particularly emphasizes the word "may" in 8 U.S.C. § 1229a(b)(5)(C), and cites this Court's decision in Lopez v. Ashcroft, which held that denial of a motion to reopen under section 1229a(b)(5)(C) "presents a matter of discretion," and that the Court "does not possess habeas jurisdiction in this case."  267 F. Supp. 2d at 153.  In Lopez, this Court also emphasized the word "may:" "It is not clear that any statutory right existed here because the statute does not require that an order be rescinded if the petitioner demonstrates exceptional circumstances; rather the statute merely states that an order 'may' be rescinded."  Id. The Court also pointed to the fact that the First Circuit reviews

48

the BIA's denial of a motion to reopen for "abuse of discretion."
Id. (citing Fesseha v. Ashcroft, 333 F.3d 13, 19 (1st Cir. 2003),
and Herbert, 325 F.3d at 70.  The Court further held that the
case did not implicate any due process concerns, because Lopez
still had the option of appealing the denial of his motion to
reopen to the First Circuit.  Id. at 153-54 & n.3.

    Kaweesa, on the other hand, argues that an alien has a
statutory right to have her case reopened, once she has
demonstrated exceptional circumstances, because any other
interpretation would render section 1229a(b)(5)(C)
unconstitutional.  Under 8 U.S.C. § 1229a(b)(5)(C), an order of
removal in absentia "may be rescinded only" in one of three
situations: exceptional circumstances, failure to receive the
required notice, or where the government prevents an alien in
custody from attending the hearing.  Kaweesa points out that the
latter two situations implicate fundamental due process concerns.
The Due Process Clause of the Fifth Amendment requires notice,
and if the government prevents an alien from attending her
hearing, it obviously denies her the right to be heard.  E.g.,
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-14
(1950).  The "may be rescinded only" language applies
independently to "exceptional circumstances," "lack of notice,"
and "governmental prevention of hearing attendance."  Kaweesa
thus argues that if this language is interpreted to be

permissive, rather than mandatory, then the statute permits a
hearing officer to leave in place a removal order entered in
violation of the Constitution.  Such an interpretation would
obviously render the statute unconstitutional.  Given that the
statute's language will bear another interpretation, namely that
the hearing officer must reopen a case when one of the three
conditions exist, that construction is to be preferred.

    Kaweesa's constitutional argument and the Court's
reexamination of the law have persuaded the Court that its
analysis in Lopez was incomplete.  There is no question that the
Due Process Clause applies to aliens in Kaweesa's position.
Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212
(1953) ("It is true that aliens who have once passed through our
gates, even illegally, may be expelled only after proceedings
conforming to traditional standards of fairness encompassed in
due process of law.").  Therefore, if 8 U.S.C. § 1229a(b)(5)(C)
gave a hearing officer discretion not to rescind a removal order
procured in the absence of notice or an opportunity for the alien
to be heard, it would violate the Constitution.  Under the
constitutional avoidance canon, an interpretation that avoids
this result is to be preferred, if the statute's language will
bear it.[10]  In turn, if the word "may" functions more like the

_____

    [10] There is a parallel argument, which Kaweesa does not
make, that such an interpretation is also preferable because it
avoids an absurd result.  See, e.g., United States v. Wilson, 503

50

word "shall" in cases involving lack of notice or governmental restraint that prevents hearing attendance, then it should function the same way in cases involving extraordinary circumstances, even absent constitutional concerns, for the same reasons that the term "judicial review" in 8 U.S.C. § 1252 should be interpreted the same way in all circumstances.

Here, the words "[s]uch an order may be rescinded only" may reasonably bear more than one interpretation. It is true that the word "may" often indicates discretion. This is more true, however, when a statute is granting power than when it is restricting power. Thus, if the statute here read, "[a]n immigration judge may rescind such an order if," that would suggest that the hearing officer has discretionary power to rescind such orders. This language only addresses things that the hearing officer <u>can</u> do, although it might imply that the list of situations where a hearing officer can rescind such orders is an exhaustive one. As the statute is written, however, it emphasizes the hearing officer's general lack of power to rescind orders of removal entered in absentia -- that is, what he <u>cannot</u> do -- and then carves three exceptions out of the general rule prohibiting rescission. In ordinary usage, the word "may" is much more ambiguous in this negative context than in a positive

---

U.S. 329, 334 (1992); <u>Atlantic Fish Spotters Ass'n</u> v. <u>Evans</u>, 321 F.3d 220, 225 (1st Cir. 2003).

context.  Kaweesa's proposed interpretation is thus a reasonable one.

First Circuit precedent undercuts this interpretation, however.  The First Circuit reviews denial of a motion to reopen under 8 U.S.C. § 1229a(b)(5)(C) for "abuse of discretion," obviously presuming that some discretion exists under this provision.  See Herbert, 325 F.3d at 70.  It does not appear that the First Circuit has ever been presented with the constitutional avoidance argument discussed above, so this Court is not necessarily foreclosed from adopting Kaweesa's interpretation. There is, however, a third reasonable interpretation that accommodates both the Due Process Clause and First Circuit precedent.

Whenever a statute grants discretion to a decision making official, that discretion has implicit boundaries set by the Constitution, through the Due Process Clause of the Fifth Amendment or the Fourteenth Amendment.  The Supreme Court recently demonstrated this in interpreting 8 U.S.C. 1231(a)(6), which permits the attorney general to detain certain aliens "beyond the [90 day] removal period."  See Zadvydas v. Davis, 533 U.S. 678, 689 (2001).  The government argued that the statute granted the attorney general unreviewable discretion to determine whether and how long to detain these aliens.  See id.  The Supreme Court, however, invoked the constitutional avoidance

canon and held that the statute did not permit indefinite detention, but rather "limit[ed] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States."  Id.

Likewise, 8 U.S.C. § 1229a(b)(5)(C) can be interpreted to provide discretion bounded by the Due Process Clause.  Under this approach, although a hearing officer has discretion to refuse to rescind a removal order in cases of exceptional circumstances, inadequate notice, or government-caused absence from a hearing, there will be any number of cases where refusal to rescind will be so fundamentally unfair as to offend the Due Process Clause. In most cases, failure to provide the required notice would make any removal order entered in absentia fundamentally unfair. There might be cases, however, where a hearing officer could refuse to rescind such an order without running afoul of the Due Process Clause.  One could imagine a situation where an alien had actual notice of a removal hearing, but did not attend, and did not file a motion to reopen his case until the government sought to enforce the removal order years later.  Similar situations could occur where the government prevented an alien from attending his original hearing.  There could certainly be cases where a hearing officer's refusal to find "exceptional circumstances" was so obviously unreasonable, so fundamentally unfair, that it would violate the Due Process Clause, but there

would be many situations where refusal to reopen for exceptional circumstances would fall far short of a constitutional violation.

Thus, 8 U.S.C. § 1229a(b)(5)(C) has a "pure legal" component and a discretionary component. The district courts have habeas jurisdiction to determine whether a hearing officer's exercise of discretion falls within implicit limits set by the statutory scheme and the Constitution, but any decision within those limits is beyond the scope of habeas review. The difference between this "fundamental unfairness" standard of review and the sort of "abuse of discretion" or "arbitrary and capricious" standard of review that the courts of appeals exercise over administrative actions is similar to the difference between the "some evidence" standard of review that applies in habeas review of an agency's factual determinations and the "substantial evidence" standard of review that the courts of appeals exercise. See Vajtauer, 273 U.S. at 106.

On the record before it, the Court cannot say that Kaweesa presented the hearing officer with facts that would render denial of her motion to reopen fundamentally unfair. This does not end the matter, however, because she does have a colorable claim that the hearing officer failed to follow the correct legal standard. See Pet'r Mem. at 8-9 (making this claim).

Whatever the boundaries of a hearing officer's discretion under 8 U.S.C. § 1229a(b)(5)(C), district courts certainly have

54

habeas jurisdiction to decide the purely legal question of whether the hearing officer followed the correct legal standard in exercising her discretion.  <u>Cf.</u> <u>Arevalo</u>, 344 F.3d at 15(citing <u>United States ex rel. Accardi</u> v. <u>Shaughnessy</u>, 347 U.S. 260, 268 (1954), and <u>Mayers</u> v. <u>INS</u>, 175 F.3d 1289, 1301 n.15 (11th Cir. 1999)) ("A right to seek relief is analytically separate and distinct from a right to the relief itself.").  When evaluating a motion to reopen under 8 U.S.C. § 1229a(b)(5)(C), "[t]he totality of the circumstances must be considered." <u>Herbert</u>, 325 F.3d at 72; <u>see</u> <u>Singh</u> v. <u>INS</u>, 295 F.3d 1037, 1039-40 (9th Cir. 2002) (suggesting that an alien's good faith and the merits of his claim are factors to be considered in determining whether "exceptional circumstances" exist).  Kaweesa argues that the hearing officer failed to consider the promptness with which she sought to reopen her case.  Pet'r Mem. at 9.  An alien's good faith and the promptness with which she seeks to remedy her absence from her hearing are indeed factors to be considered. <u>See, e.g.</u>, <u>Singh</u>, 295 F.3d at 1039-40; <u>Nazarova</u> v. <u>INS</u>, 171 F.3d 478, 481 (7th Cir. 1999), and <u>In re J-P-</u>, 22 I. & N. Dec. 33 (BIA 1998)).  Moreover, the hearing officer made no mention of the horrific trauma Kaweesa claimed to have suffered in Uganda -- the sort of trauma that can lead to the mental disorders of the kind that the undisputed record evidence shows Kaweesa suffers.  Perhaps most importantly, the hearing officer did not consider

55

Kaweesa's likelihood of success if her case were reopened. <u>See</u> <u>Singh</u>, 295 F.3d at 1039-40. Although the Court does not pass on the merits of these contentions or whether they warrant relief, the Court holds that they state a claim that is cognizable in habeas.

<b>b. Procedural Requirements</b>

Even if Kaweesa has stated the sort of claim that this Court can consider on habeas review, the question remains whether Kaweesa satisfies the procedural requirements for this Court to consider that claim. Because Kaweesa could have raised this claim on direct review of the BIA's May 6, 2002 affirmance, this Court must decline to exercise habeas jurisdiction unless Kaweesa falls within one of the exceptions to the common law exhaustion doctrine that applies in this context. These circumstances include situations when: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." <u>Beharry</u>, 329 F.3d at 62 (quoting <u>Able</u>, 88 F.3d at 1288) (citations and internal quotation marks omitted).

This Court has already suggested that habeas will tend to lie where a due process violation has frustrated an alien's direct appeal. <u>See</u> <u>Chmakov</u>, 266 F.3d at 215; <u>Kelly</u>, 256 F. Supp.

56

2d at 99.  Kaweesa argues that Almondel's actions constituted ineffective assistance of counsel, and operated to deny her direct review of the BIA's May 6, 2002 decision.

"Deportable aliens possess a Fifth Amendment due process right to be free from incompetent legal representation which renders their deportation proceedings 'fundamentally unfair.'" Betouche v. Ashcroft, 357 F.3d 147, 149 (1st Cir. 2004) (citing Hernandez, 238 F.3d at 55); see also 8 U.S.C. § 1362 (affording aliens a statutory right to counsel at their expense).  To make a successful ineffective assistance of counsel claim, an alien must also "establish at least a reasonable probability of prejudice" resulting from the attorney's actions.  Betouche, 357 F.3d at 151 n.8.

The BIA has set up a procedure to reopen deportation orders in cases involving ineffective assistance of counsel.  Under Matter of Lozada, 19 I. & N. Dec. 637, 639 (BIA 1988), to ensure that such claims do not involve collusion or serve as a means to delay deportation, a motion to reopen on these grounds should be supported by:

> (1) an affidavit describing in detail the agreement between the alien and his counsel regarding the litigation matters the attorney was retained to address; (2) evidence that the alien informed his counsel as to the alien's ineffective assistance allegations and afforded counsel an opportunity to respond; and (3) evidence that the alien had either filed a complaint with the appropriate disciplinary authority regarding the attorney's ethical or legal

malfeasance, or a valid excuse for failing to lodge
such a complaint.

Betouche, 357 F.3d at 149 (citing Lozada, 19 I. & N. at 639).

As a prudential matter, the First Circuit ordinarily requires an alien to pursue any ineffective assistance of counsel claim with the BIA, subject to the Lozada requirements, before permitting such a claim to be considered on habeas review. Hernandez, 238 F.3d at 54-55. The First Circuit has emphasized the importance of the Lozada requirements in preventing meritless and collusive ineffective assistance claims and ensuring that the hearing officer has the fullest possible record before her in reaching her decision. Betouche, 357 F.3d at 150-51. Kaweesa has never raised an ineffective assistance of counsel claim before the BIA.

The First Circuit has clearly articulated a prudential exhaustion regime in this context:

> In the ordinary case, we agree that the respondent must use the Board's own procedures to resolve his competency of counsel claims. Absent a threat of immediate deportation, a district court should in general decline to entertain a habeas petition challenging competency of counsel. Even if such a threat impends, the respondent still ought to show good cause why he has not previously sought a discretionary stay of deportation, as well as reopening, from the Board. However, unless rigidly prescribed by statute, exhaustion may be excused where there is reason to do so.

Hernandez, 238 F.3d at 55 (internal citation omitted).

This decision is arguably in conflict with Sayyah, which held that the statutory exhaustion requirement in section 1252(d) (rather than the common law exhaustion doctrine) applies to habeas cases. The Sayyah panel had no power to overrule Hernandez, however. The "law of the circuit" doctrine "holds a prior panel decision inviolate absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course." United States v. Chhien, 266 F.3d 1, 11 (1st Cir. 2001).

This Court then must reconcile Sayyah and Hernandez, to the extent possible. The two cases make sense together if it is recalled that the BIA lacks power to adjudicate a constitutional ineffective assistance of counsel claim. It can only consider analogous claims under its regulations. Thus, although section 1252(d) applies to habeas claims, it cannot require an immigrant to raise the constitutional claim before the BIA; it can only require her to raise the regulation-based one, because the only tribunal authorized to consider her constitutional claim is an Article III court. The common law exhaustion doctrine, however, can require an immigrant to raise the analogous regulation-based claim before the BIA, as a prerequisite for permitting her to raise the constitutional claim before a habeas court.

The government argues that Kaweesa has not established a prima facie claim for relief on ineffective assistance of counsel grounds.  First, the government urges that Kaweesa can only succeed if she shows that both Almondel and Cashman provided ineffective assistance.  Resp't's Mem. at 11-13.  This argument makes no sense.  Even if Cashman's representation was exemplary, it is undisputed that Kaweesa retained a new attorney, Almondel, when it came time to appeal the BIA's May 6, 2002 decision.  If Almondel told Kaweesa that he had filed her appeal, and he in fact had done no such thing, his actions easily constitute ineffective assistance, and there can be no doubt that they were the direct cause of Kaweesa's failure to obtain direct review in the court of appeals.

The government next argues that Kaweesa has procedurally defaulted on her claim, because she failed to raise it before the BIA in either of her subsequent motions to reopen.  The government cites two cases that stand for the obvious proposition that exhaustion of administrative remedies with respect to an ineffective assistance of counsel claim is required before a court of appeals can hear the claim.  See Resp't's Mem. at 13; see also Bernal Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999) (holding that an ineffective assistance of counsel claim requires exhaustion before being raised on direct review); and Ravindran v. INS, 976 F.2d 754, 761 (1st Cir. 1992)) ("Issues not raised

60

before the Board may not be raised for the first time upon judicial review of the Board's decisions."). The question, however, is whether Kaweesa falls within any of the exceptions to the common law exhaustion doctrine.

The First Circuit has stated that "exhaustion may be excused where there is reason to do so." Hernandez, 238 F.3d at 55. There is an exception to the prudential exhaustion requirement "in certain cases [where] a plaintiff has raised a substantial constitutional question." Beharry, 329 F.3d at 62. Arguably, the exception for when "available remedies provide no genuine opportunity for adequate relief" can sometimes apply to ineffective assistance claims as well. See id.

Here, Kaweesa's ineffective assistance claim raises serious concerns under the Due Process Clause. There can be little doubt that Almondel's alleged destruction of Kaweesa's right to judicial review was "fundamentally unfair," and the prejudice from her failure to obtain direct review is likely considerable. The record before this Court strongly suggests that Kaweesa is entitled to remain in this country, and that a hearing officer would so find if the government ever were to give her a hearing. Had Kaweesa been able to appeal all the way to the First Circuit, she would have been able to obtain review under an abuse of discretion standard. Her argument that the hearing officer did not apply the totality of the circumstances test has considerable

61

force.  She might well have obtained a hearing on the merits,
whether the First Circuit reversed the hearing officer's decision
or merely remanded for reconsideration.[11]

Moreover, there is no evidence that Kaweesa's failure to
advance her ineffective assistance claim in subsequent
proceedings before the BIA was in any way intentional or in bad
faith.  From the record before the Court, it appears that
Kaweesa's subsequent motions to reopen were filed under more or
less emergency conditions, and Kaweesa rightly focused on the
actual merits of her asylum claim and her claim for withholding
of removal under the Convention Against Torture.

The fact that Kaweesa has a strong claim under the
Convention Against Torture provides an additional reason for
relaxing the prudential exhaustion requirement.  The prudential
exhaustion doctrine that applies here is a creature of federal

---

[11] The government cites cases where courts have upheld
particularly harsh BIA denials of motions to reopen, as evidence
that Kaweesa would not have received any relief from the First
Circuit.  See Resp'ts Mem. at 15 (collecting cases).  In Thomas
v. INS, 976 F.2d 786 (1st Cir. 1992), for example, the First
Circuit held, over the dissent of then-Chief Judge Breyer, that
the BIA did not abuse its discretion in denying a motion to
reopen a deportation order, which had been entered in absentia
after the alien and his counsel showed up ten minutes late to the
hearing.  Id. at 788-90.  Nothing in Thomas suggests that the BIA
applied the wrong legal standard, however.  Nor is there any
suggestion that the alien in that case suffered from PTSD.
Although Kaweesa did not know in 1999 that she suffered from
PTSD, depression, and anxiety, the hearing officer should have
considered the possibility that the horrific trauma she alleged
she had suffered likely impacted her ability to function.

common law, and common law doctrines should be applied in a manner consistent with the United States' international legal obligations. As a party to the Convention Against Torture, the United States has undertaken an international legal obligation not to "expel, return or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." See Convention Against Torture, Art. 3. The principles in the Convention Against Torture are widely acknowledged to be part of customary international law. See Filartiga v. Pena-Irala, 630 F.2d 876, 881-82 (2d Cir. 1980) (referring to the ban on torture as "part of customary international law"); Restatement (Third) of the Foreign Relations Law of the United States § 702 (1987).[12] The legal principles in treaties to which the United States is a party and in customary international law are part of federal common law. See Kane v. Winn, 319 F. Supp. 2d 162, 196-97, 200-01 (D. Mass. 2004) (discussing the long line of Supreme Court

---

[12] See also Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1149-50 (7th Cir. 2001); United States v. Matta-Ballesteros, 71 F.3d 754, 764 n.5 (9th Cir. 1995) (citing Comm. of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 939-40 (D.C. Cir. 1988), and Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir. 1992)); Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1344 (N.D. Ga. 2002); Taveras-Lopez v. Reno, 127 F. Supp. 2d 598, 609 (M.D. Pa. 2000); White v. Paulsen, 997 F. Supp. 1380, 1383 (E.D. Wash. 1998); Xuncax v. Gramajo, 886 F. Supp. 162, 183 n.25 (D. Mass. 1995) (Woodlock, J.); Paul v. Avril, 901 F. Supp. 330, 335 (S.D. Fla. 1994); Restatement, supra, §§ 102, 702 & cmt. (n).

cases to this effect).  Thus, where a court has a measure of discretion as to whether to exercise habeas jurisdiction, and failure to exercise such jurisdiction would result in the deportation of an individual to a country where she would most likely be tortured or even killed, the court should err on the side of exercising jurisdiction.

The government's next line of argument is that at most, Kaweesa's ineffective assistance claim entitles her to equitable tolling of the time to file an appeal of the BIA's May 6, 2002 decision to the First Circuit.  See Resp'ts Mem. at 14-15.  The government relies on Rodriquez-Lariz v. INS, 282 F.3d 1218, 1224-25 (9th Cir. 2002), but that case involved direct review of the BIA's refusal to apply equitable tolling in deciding whether to grant a motion to reopen.  The fact that the BIA must equitably toll in some circumstances does not mean that equitable tolling is the only form of relief this Court can provide on habeas for an ineffective assistance of counsel claim.  Moreover, if any court can determine whether to toll equitably the period for appeal to the First Circuit, it is that court, not this one.  Yet, were the First Circuit confronted with a petition for direct review asking for equitable tolling, 8 U.S.C. § 1252(d) would require dismissal for failure to exhaust administrative remedies on the ineffective assistance claim.  The alien would then have

to file a motion to reopen before the BIA, and then appeal that decision to the First Circuit.  This cannot be the law.

The Court therefore has jurisdiction to review and to grant appropriate relief regarding Kaweesa's claim that the hearing officer failed to apply the correct legal standard in determining whether exceptional circumstances justified the reopening of Kaweesa's case.

### 2.  The BIA's November 12, 2003 Denial of Kaweesa's Motion to Reopen

Kaweesa also seeks habeas review of the BIA's November 12, 2003 decision.  She has two main contentions.  First, she argues that the BIA's opinion only addressed her asylum claim, not her claim for withholding of removal under the Convention Against Torture.  Whereas asylum <u>may</u> be granted when an alien has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. §§ 1101(a)(42)(A), 1158(b), withholding of removal under the Convention Against Torture <u>must</u> be granted if the alien demonstrates that "it is more likely than not that [the alien] would be tortured if removed to the proposed country of removal," 8 C.F.R. § 208.16(c)(2).  An alien's credible testimony may be sufficient to carry the burden, and a hearing officer must consider all relevant evidence, including evidence of past persecution. <u>Id.</u> § 208.16(c)(3).  Second,

Kaweesa argues that the BIA did not properly consider the evidence before it.

Although the parties agree that Convention Against Torture claims can be raised on habeas review, Kaweesa has not established that her claim falls within any exceptions to the common law exhaustion requirement that applies here. Kaweesa could have challenged the BIA's decision in a direct appeal to the First Circuit, and she offers no reason why she did not do so. It appears that her attorney informed her that an appeal was possible, but discouraged it. There is no suggestion that this discouragement constituted ineffective assistance of counsel, and a fair reading of the BIA's opinion suggests that it may well have been reasonable advice.

The closest Kaweesa comes to offering this Court a reason to exercise habeas jurisdiction is her assertion that the BIA's alleged failure to consider her Convention Against Torture claim was a violation of her procedural due process rights under the Due Process Clause of the Fifth Amendment. See Pet'r Mem. at 13. Unlike Almondel's ineffective assistance, however, any due process violation here did not operate to deprive Kaweesa of the opportunity for review in the First Circuit. Although the procedural due process claim is of a type that habeas courts can consider, it can only be heard if Kaweesa had some compelling

reason for failing to raise the claim before the First Circuit in a timely fashion.

### 3.   The BIA's May 3, 2004 Denial of Kaweesa's Motion to Reopen

Fairly read, Kaweesa's memorandum also challenges the BIA's May 3, 2004 decision.  This claim has effectively been before the Court since the date of the BIA's decision -- that is, since May 3, 2004.  There is no applicable exception to the common law exhaustion requirement that would justify this Court's exercise of habeas jurisdiction.  Given that the BIA's May 3, 2004 decision was challenged more or less immediately, well within the time limit for appeal to the First Circuit, it is appropriate to treat Kaweesa's claim here as a petition for direct review that has simply been filed in the wrong court.

Under 28 U.S.C. § 1631:

Whenever a civil action is filed in a court . . . or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

It is appropriate for this Court to transfer Kaweesa's claim for review of the BIA's May 3, 2004 decision to the First Circuit for resolution.  The First Circuit has specifically approved this

67

practice, where an alien files an action in a district court that contains some claims appropriate for direct review and some that are appropriate for habeas review.  See Arevalo, 344 F.3d at 6, 15.  Once the First Circuit has passed on any claims appropriate for direct review, it is then free to transfer the case back to the district court for resolution of the remaining habeas claims. See id. at 15-16.

### 4.    Claim for Other Relief Based on Hardship.

Kaweesa argues more generally that, if no other relief is available, the Court should at least be able to remand to the BIA for reconsideration in light of the hardships with which she is faced.  See Pet'r Mem. at 11 (citing Pimental-Navarro v. Del Guercio, 256 F.2d 877 (9th Cir. 1958)).  It would be premature for the Court to pass on this claim before the First Circuit reviews the BIA's May 3, 2004 decision, and this Court reviews the May 6, 2002 decision.

## III. CONCLUSION

For the reasons above, the Court held on November 12, 2004 that it has habeas jurisdiction over Kaweesa's claims regarding the BIA's May 6, 2002 decision.  Because Kaweesa's claim regarding the BIA's May 3, 2004 decision falls exclusively within the jurisdiction of the Court of Appeals of the First Circuit, however, this case was transferred to that court under 28 U.S.C. § 1631 on that date.

/s/ William G. Young

WILLIAM G. YOUNG
CHIEF JUDGE